99 S.E.2d 15 (1957)
The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR
v.
Frank A. PIETRANTON.
No. 10838.
Supreme Court of Appeals of West Virginia.
Submitted April 30, 1957.
Decided July 2, 1957.
*16 C. Lee Spillers, Wheeling, W. W. Ingram, Chester, for plaintiff in error.
Thomas C. Damewood, Charleston, Clarence E. Martin, Martinsburg, R. Evans Stealey, Parkersburg, W. M. Woodroe, Charleston, for defendant in error.
J. H. Brennan, Judge of the Circuit Court of Hancock County, Wheeling, amicus curiae.
GIVEN, Judge.
By notice dated July 16, 1953, the Committee on Legal Ethics of the West Virginia State Bar notified defendant, Frank A. Pietranton, an attorney duly licensed to practice law in West Virginia, that a complaint, signed by Eugene James Iacuone, had been filed with the committee, charging defendant with wrongful, unprofessional and unethical conduct in connection with a certain action at law wherein defendant represented Mr. Iacuone, and that a formal hearing regarding his professional conduct in connection with the case was warranted, and fixing a time for a hearing on the charges contained in the complaint. Continuances of the hearing were granted from time to time by the committee, usually on motion of defendant, and usually because of the pendency in court of one or more of certain proceedings having some relation to the matters charged in the complaint. At a meeting of the committee held August 15, 1955, it was ordered that "a verified complaint against the said Frank A. Pietranton be forthwith filed in the Circuit Court of Hancock County * * * accompanied by a report of the proceedings heretofore had before said Committee on Legal Ethics", with "recommendation that the license of the said Frank A. Pietranton to practice as an attorney at law in the courts of this state be annulled". The complaint of the committee, verified by the then chairman of the Committee on Legal Ethics, was accordingly filed in the Circuit Court of Hancock County, on October 14, 1955, and defendant was ordered to show cause "why the recommendation as contained in said complaint and in the recommendation in writing filed therewith should not be put into effect".
The complaint of the committee alleges, in effect, that about January 21, 1949, defendant was employed by Eugene James Iacuone to represent him in an action at law for recovery of damages for personal injuries sustained in a motor vehicle accident; that the compensation to be received by defendant for such services was on a contingent fee basis; that defendant employed Frank A. O'Brien, Sr. to assist in the prosecution of the action; that the action instituted was compromised and settled by the payment of $18,500; and that in the distribution of the sum recovered in the action defendant "violated certain provisions of the Code of Ethics Governing the Professional Conduct of Attorneys-at-Law and the practice of Law in the State of West Virginia".
The complaint of the committee then charges, in effect, that defendant did "feloniously embezzle, fraudulently convert to his own use, and steal the sum of Two Thousand Eight Hundred Thirty-three Dollars and Thirty-three Cents ($2,833.33), of the money and property of Eugene James Iacuone"; that defendant "wilfully, knowingly, fraudulently, and with intent to deceive, stated and represented to Eugene James Iacuone, and to Diana Iacuone, that in order to obtain a compromise and settlement for more than Ten Thousand Dollars ($10,000.00) of the then pending action *17 * * * it was necessary to bribe" the attorney then representing an insurance company; that defendant retained the sum of $2,833.33 in excess of the fee provided for in the contract of employment; that defendant, in the distribution of the sum received, "for the wilful, fraudulent and unethical purpose of deceiving the said Frank A. O'Brien and to induce him to believe that said sum of Six Thousand One Hundred Sixty-Six Dollars and Sixtysix Cents, ($6,166.66) was the total compensation" received for legal services rendered in said action, wrote a certain letter to O'Brien enclosing therein a check for the sum of $3,083.33, making certain notations on the check "to conceal his said embezzlement of the proceeds of" the check; and that defendant, in a certain pending court proceeding, "wilfully, falsely, corruptly and feloniously did testify and say, in substance and effect, that his contingent fee contract with Eugene James Iacuone was for 50% of the recovery; that the division and distribution of the money derived from the compromise and settlement of said personal injury action was made in Hancock County; that his agreement with Frank A. O'Brien was for one-half of one-third of the fees collected * * *".
Defendant filed his answer to the complaint of the committee, denying the material allegations thereof as to any fraud, misrepresentations, or other unethical or unprofessional conduct. The matter was heard by the Circuit Court of Hancock County, the Honorable Decatur H. Rodgers presiding, on the record made before the committee, consisting of the printed records of certain cases, briefs, exhibits and other papers filed in those cases, and certain exhibits and affidavits filed in this proceeding, all made part of the record in the instant proceeding by agreement. The circuit court, on the 6th day of February, 1956, found that defendant was guilty of fraudulently converting to his own use the sum of $2,833.33 of the money of Iacuone; that defendant falsely represented to the Iacuones that it was necessary to bribe and pay unto an attorney for an insurance company the sum of $2,833.33 in order to obtain the compromise settlement of $18,500; that defendant swore falsely in a certain pending court proceeding; and that defendant "has been guilty of fraud and deceit in his professional dealings as an attorney at law with his client Eugene James Iacuone". An order was entered on the findings, February 6, 1956, annulling the license of defendant to practice law.
From the order annulling the license of defendant, a writ of error was granted by this Court. The case was first submitted to this Court for decision September 18, 1956. A decision was made by the Court reversing the action of the trial court, and a per curiam opinion was filed setting forth the reasons for the decision. This Court, however, in accordance with the prayer of a petition duly filed, granted a rehearing of the proceeding. The questions involved have been re-argued, and the case again submitted for decision.
A number of proceedings have been before this Court involving, directly or indirectly, some of the questions and contentions pertinent to an understanding of the matters here involved, or, as contended, furnish a background picture for such questions and contentions. See State v. Pietranton, 140 W.Va. 444, 84 S.E.2d 774, sometimes herein referred to as the second criminal case; Iacuone v. Pietranton, 138 W.Va. 776, 77 S.E.2d 884, sometimes herein referred to as the civil case; State v. Pietranton, 137 W.Va. 477, 72 S.E.2d 617, sometimes herein referred to as the first criminal case; State ex rel. Fahey v. Brennan, 139 W.Va. 122, 79 S.E.2d 109; Fahey v. Brennan, 137 W.Va. 37, 70 S.E.2d 438; and Fahey v. Brennan, 136 W.Va. 666, 68 S.E.2d 1. The records of the first three cases cited are made parts of the record in the instant proceeding. We believe that a general statement of the pertinent facts here will facilitate a consideration and understanding of the questions to be discussed.
*18 Because of vigorous contentions as to the pertinency of certain facts not directly connected with the action at law prosecuted by defendant on behalf of Mr. Iacuone, concerning which the unprofessional conduct of defendant is charged, we attempt to state such facts sufficiently to enable an understanding of the contentions. Defendant, while Prosecuting Attorney of Hancock County, prosecuted a criminal action against Russell Dennis Hurst, indicted on a charge of voluntary manslaughter. Hurst was acquitted of the charge, but a number of witnesses who testified on behalf of the defendant were indicted, convicted and sentenced on false swearing charges, in connection with their testimony given at the trial of Hurst. Petitions for writs of error to at least some of such judgments were denied by this Court. Attorneys representing defendants in the false swearing trials, or some of the defendants, were William T. Fahey, Martin F. Fahey, J. Clarence Spitznogle, an associate of the Faheys, Frank A. O'Brien, Sr., and possibly others. The false swearing charges were very vigorously prosecuted and very vigorously defended. Revengeful anger, perhaps feelings of hatred, arose, and, it is contended, increased with time. Spitznogle was indicted on charges growing out of the false swearing charges as "John Doe". Complaints charging unprofessional conduct were filed against the Faheys, and they have been acquitted of such charges. Defendant in the instant proceeding was indicted, prosecuted and found not guilty by a jury in connection with the alleged forging of a will supposed to have been executed by Edwin Otto Spies, in addition to the indictments and the prosecution of the civil action involving directly the Iacuone matter. The situation generally, perhaps, may be sufficiently reflected by a statement made in the written opinion of the trial court: "Neither of the Faheys are parties to the instant proceeding, nor are they witnesses as to anything pertinent to this investigation. They are bitter toward Pietranton, have been active in procuring evidence against him in the Spies case and brought the Iacuone matter to Mr. O'Brien's attention, with the result that Mr. Pietranton has been subjected to four criminal and one civil trial and to this proceeding to disbar him. Their activity has been motivated by hatred and a malignant purpose to have revenge * * *". It may not be assumed, however, that evil motives inducing a prosecution of charges against an attorney, involving his license to practice law, constitute any defense to such charges. We assume, however, that it will not be questioned that where such improper motives are clearly shown to exist on the part of persons active in such a prosecution, that the evidence and facts from which inferences must be drawn should be carefully considered. A more detailed statement of such facts may be found in the opinions of this Court in the three cases styled Fahey v. Brennan cited above.
In January, 1949, Eugene James Iacuone was seriously and permanently injured in a motor vehicle accident. About one week after the accident, Mrs. Iacuone, the wife of Eugene James Iacuone, went to the office of defendant for the purpose of employing him to prosecute an action for recovery of damages for personal injuries suffered by Mr. Iacuone as a result of the accident. Terms of the employment were agreed to by Mrs. Iacuone and defendant, but it was understood that a written contract would be prepared by defendant and executed by Mr. Iacuone. A memorandum of the terms of the agreement, prepared by defendant, was handed to Joseph DeFranco, then an employee and investigator in the office of defendant, with instructions to prepare the written contract of employment and obtain its execution by Mr. Iacuone. DeFranco did prepare the contract and, with Mrs. Iacuone, went to the hospital where Mr. Iacuone was confined, and where Mr. Iacuone signed the contract. Mrs. Iacuone also signed the contract. The terms of *19 the contract were by Mrs. Iacuone and DeFranco explained to Mr. Iacuone, but it seems doubtful whether Mr. Iacuone, because of his serious injuries, was physically or mentally capable of understanding the terms thereof. No question is raised, however, as to the execution of the contract, nor has any contention ever been made to the effect that the terms incorporated in the contract were, in any respect, different from the terms agreed to by Mrs. Iacuone and defendant. Apparently, copies of the contract were made by DeFranco, but whether a copy was delivered to Mr. or Mrs. Iacuone is not certain. At no trial has the original contract, or a copy, been produced.
After the execution of the contract, defendant made, or caused to be made, certain investigations as to matters deemed essential to a proper prosecution of the action, and an action was instituted by him. After the institution of the action, defendant sought and obtained the assistance of Frank A. O'Brien, Sr., an attorney, in the prosecution of the action. The action instituted by defendant was dismissed and a new action instituted subsequent to the employment of O'Brien, apparently for the purpose of including in the action, as a defendant, a person not proceeded against in the action first instituted. The action was matured for hearing and set for trial, but before trial a compromise was effected whereby a recovery of $18,500 was obtained, payment thereof being made by check of an insurance company drawn to the order of "Eugene J. Iacuone and Frank A. Pietranton and Frank A. O'Brien, his attorneys". The check, dated December 6, 1949, was indorsed by Frank A. O'Brien and delivered to defendant for his indorsement and for final distribution of the proceeds.
Distribution of the $18,500 was made by defendant on December 8, 1949. Present at the time were defendant, Mr. and Mrs. Iacuone, and Robert Cipriani, a brother of Mrs. Iacuone. The check for the $18,500 was indorsed by Mr. Iacuone, returned immediately to defendant and by him deposited in a fiduciary bank account from which he alone withdrew funds. Defendant then delivered to Mr. Iacuone his check drawn on the fiduciary bank account, payable to the order of Eugene James Iacuone, in the amount of $9,000.01, and his check in the amount of $500, drawn on the same account, payable to the order of F. B. Harrington, the personal physician of Mr. Iacuone. Defendant then presented to Mr. Iacuone for indorsement a check numbered 189, drawn on the account wherein the check for the $18,500 was deposited, payable to the order of Eugene James Iacuone, in the amount of $2,833.33, which check was indorsed by Mr. Iacuone, immediately returned to defendant and by him deposited in his personal bank account. It is the sum represented by the last mentioned check that has been the source of the litigation mentioned, and forms the basis for this proceeding, it being contended by the committee that the sum represented by the check was in excess of the fee to which defendant was entitled under the employment contract, and defendant contending that it was the part of the fee to which he was personally entitled under the contract, over and above the amount of the fee to which his associate counsel was entitled.
In the settlement of the fee due associate counsel, Frank A. O'Brien, Sr., defendant drew a check on the fiduciary bank account, dated December 8, 1949, in the amount of $3,083.33, payable to the order of O'Brien and O'Brien, Attorneys, and mailed it to Mr. O'Brien, with a letter wherein he stated: "I am enclosing herewith my check in the amount of $3,083.33, representing one-half share of the fee of $6,166.66 obtained in the Iacuone Case".
The check over which the controversy exists contains no notation thereon as to the purpose for which it was drawn. The check in the amount of $9,000.01, payable to Eugene James Iacuone, contains this *20 notation: "This check to Iacuone $9000.01 Check No. 189 to Iacuone $2833.33 Check No. 190 to Dr. F. B. Harrington $500.00 Total $12333.34 In full of Settlement [after the word Settlement a perpendicular ink mark] Atty fee $6166.66 [the word "fee" being written immediately under the abbreviation "Atty"] $18500.00 settlement amount". The check payable to the order of O'Brien and O'Brien, Attorneys, bears the following notation: "Att'ys fee in Eugene James Iacuone v. Lackmanek et al $6166.66 One half of fee $3083.33 One-third of $18,500=$6166.66".
From the outline of the pertinent facts involved it has probably become apparent that the whole controversy, all charges against defendant, arises out of the contingent fee contract made by the Iacuones with defendant. Certain of the charges relate to the transactions between defendant and his associate counsel but it seems to be conceded, and we think rightly, that such charges fail if the evidence establishes that the contract between the Iacuones and defendant provided for a contingent fee of fifty per cent of any amount recovered, and if the contract between defendant and O'Brien was to the effect that O'Brien was to receive as his fee one half of one third of any recovery. The brief of the committee filed on this rehearing points out that if "defendant's contract with Iacuone was that defendant was to receive a fee 50% of the recovery, and that his contract with O'Brien was that he was to pay O'Brien one-half of one-third of the recovery", defendant "would not have dealt unfairly with either client or co-counsel". Thus is the position of the committee, as well as the position of the defendant, made definite and clear. The conflicting positions, however, make it necessary to state fully the evidence relating to the terms of the two contracts.
In about fourteen months after the settlement Joseph DeFranco, whose activities in connection with the matters involved will be discussed later, had a conversation with Mrs. Iacuone concerning the settlement and, according to a written statement made by him, he suggested to her that she "see O'Brien and Fahey and suggest to them that F. A. P. [Frank A. Pietranton] said he got the extra money to bribe the Insurance lawyers". In a very short time after the conversation Mr. and Mrs. Iacuone did visit the office of Mr. O'Brien and signed the statement dated February 27, 1951, which furnishes the basis of the complaint against defendant filed with the committee. Mr. O'Brien testified that he requested the Iacuones to come to his office after he "had received information in Weirton, and I think it was in the offices of Fahey and Fahey, to the effect that one man by the name of DeFranco, whom I didn't know, was telling it around that I had been cheated", and that J. Clarence Spitznogle came to Mr. O'Brien's office with the Iacuones. In the statement made by Mrs. Iacuone she says that defendant told her "his fees would be 25 per cent if it was settled out of court before the trial was scheduled, 331/3 if it was settled after the trial date had been set or 40 per cent if it went to court or had to be appealed it would still be 40 per cent and he would pay all expenses". On the trial of the first criminal case she testified that she told Mr. Iacuone, at the time of the execution of the contract, that "It was a third if the trial was scheduled and 25 per cent if it was settled before there was any trial scheduled, and, just like I told you, 35 per centI am almost positive it was thereif the trial went on, and 40 per cent if it had to be appealed, and Mr. Pietranton would take care of all expenses". On the last criminal trial she testified that the contract provided that defendant was to receive "25 per cent was if there was no suit started. 331/3 if the suit was started and didn't go to trial. 35 per cent if the trial went on and 40 per cent if it had to be appealed". In the civil action she testified that defendant "named his fees would be 25 if we settled out of court, 33 and one-third if the trial was scheduled and didn't go on. *21 35 per cent if the trial went on, 40 per cent if the trial went on or had to be appealed, and regardless of whatwhatever happenedafter it would still be 40 per cent, and he would take care of all expenses which was connected with the case". Before the grand jury she testified that defendant said "his fee would be one-fourth if it was settled out of court before any trial was set and one-third if the trial was scheduled but it was settled before the trial went on, or 40 per cent if the trial went on, or if it had to be appealed it was still 40 per cent".
The testimony of Mr. Iacuone is not helpful. On the first criminal trial he was asked, "You were not told what the percentage was in case of recovery or settlement?" His answer was, "I don't remember that either". On the last criminal trial he was asked, "You don't recall the terms of the contract when you signed it?" His answer was, "No, I don't think I do". On the trial of the civil proceeding he remembered nothing of the terms of the contract.
Cipriani, a brother of Mrs. Iacuone, was present at the time of the delivery of the check by defendant to Mr. Iacuone. At the first criminal trial he testified that at the time of the delivery of the check defendant "explained to me, the terms of the contract were that ifif he obtained a settlement from the insurance company before the trial date was set, that he was to receive twenty-five per cent. If the trial date had been set he was to receive thirty-three and one-third per cent of final settlement, and I am not sure, but I believe that if the trial was to gothe trial had begun and then there was a settlement before it went to the jurythat he was to receive thirtyfive per cent, and if there was an appeal, regardless of how many appeals, he was to receive forty per cent; also regardless of how many appeals, and so forth, he was to receive no more than forty per cent, and he was supposed to pay all the expenses". His testimony was to the same effect at the last criminal trial and the trial of the civil action.
Hugo J. Broccolini accompanied Mrs. Iacuone to the office of defendant at the time defendant was first consulted as to his employment and, while in an outer office, heard part of the conversation concerning the terms of the employment, "heard them discussing the age question. I heard something about 35either 33 and one-third or 35 per centand I heard something about 50 per cent"; that he believed Mr. Pietranton made the statement "about the 50 per cent"; and that he only "got fragments" of the conversation. It may be noticed that the testimony of this witness relates only to the discussion of the terms of the contract, not to the actual agreement.
Defendant, on the trial of the first criminal case, was asked the following questions, to which he made the following replies: "What were the provisions of the contract? A. Number one, that the Iacuones employed me to represent them in this situation involving an accident in which he had lost his leg. Number two, that I would use every bit of skill and ability that I possess to bring about as favorable recovery as possible. Number three, that in the event there was no recovery, that I would make no charge to the Iacuones, and, number four, that the Iacuones would be responsible for any costs that I might advance in the prosecution of the suit, and if we lost the case they would be responsible for those costs. Q. And the percentage? A. Fifty per cent, sir." His evidence was to the same effect on subsequent trials.
Dwight Trushel, an attorney practicing in Hancock County and apparently an assistant prosecuting attorney of that county at the time of the execution of the contract between defendant and Mr. Iacuone, and who filed a praecipe in one of the actions instituted on behalf of Mr. Iacuone and who saw the contract, testified on the trial of the first criminal case that "Mr. Pietranton was to receive fifty per cent or nothing". On the trial of the last criminal case he *22 testified: "There was a contract which was prepared for the Iacuones, engaging Mr. Pietranton as their attorney, briefly stated the case he was to help them in, and that he would do his best to get the best recovery for them, and he was to receive 50 per cent of any recovery that was made. If there was no recovery Mr. Pietranton was to receive nothing."
Dolores Kozielska, who was defendant's secretary, saw the contract and testified on the trial of the first criminal case that "it was a contract for fees, employing Mr. Pietrantona fifty per cent contract". On the trial of the last criminal case she testified, "I know there was a contract between the Iacuones and Mr. Pietranton for fifty-fifty".
The only other witness testifying directly as to the terms of the contract between Mr. Iacuone and defendant is DeFranco. At the time of the employment of defendant by Mr. Iacuone, DeFranco was employed as an investigator in the offices of defendant. At defendant's request DeFranco prepared the contract and, with Mrs. Iacuone, took it to the hospital where Mr. Iacuone was confined and obtained the signatures of Mr. and Mrs. Iacuone thereto. Later, he was relieved of his employment by defendant, which apparently resulted in bitter resentment toward defendant, but which feeling DeFranco pretended to have overcome before the trial of the first criminal case. On the trial of the first criminal case he was called as a witness by defendant. He testified: "To the best of my knowledge, it was a fifty per cent contract. Q. Who told you to make it a fifty per cent contract. A. Mr. Pietranton". On his further examination, however, the following questions were asked, to which he gave the following answers: "Q. We are talking about the contract you had these people sign. A. Yes. Q. Tell us what the terms of the contract were. A. 33 and one-third per cent for writing up the declaration or petition before trial, 50 per cent in the event that Mr. Pietranton had to hire associate counsel or he had to high pressure an insurance company in making settlement, something to that effect". He was not called as a witness in the trial of the civil action. On the trial of the second criminal case, he testified: "There were four stages in the contracton a graduated scaleand the best of my knowledge the first stage was 25 per cent for accepting the contract and doing the investigative work, and if there should be a settlement out of court, and there was a 331/3 per cent contract if the case went to trial. I believe there was a 40 per cent contractwhat the terms of that was I don't knowbut the 50 per cent contract as I recall, was if the case had to go before the Supreme Court and it was necessary for Mr. Pietrantonand it was necessary for Mr. Pietranton to hire associate counsel in the case". In a statement relating to the facts involved in the criminal trial and the facts involved in the Spies will matter, evidently prepared by DeFranco in an effort to obtain immunity from prosecution of criminal offenses against him as to testimony theretofore given by him, he says: "After having testified falsely before the Brooke County Grand Jury regarding the Spies will, my conscience bothered me to the extent that I felt compelled to make a clean break of it all * * * I was very angry, bitter and hurt over my differences with F.A.P. * * * and as well as his opposition to me when I ran for County Clerk of Hancock County * * * I had also told Wm. T. Fahey that I met Mrs. Iacuone on the street in Weirton and learned from her that she was dissatisfied about the fact that F.A.P. took 50 per cent * * * and that I had suggested to her to see O'Brien and Fahey and to suggest to them that F.A.P. said he got the extra money to bribe the insurance lawyers. I had known about the 331/3 per cent with O'Brien and that F.A.P. was to get 50 per cent. I also told P.A. of B. C. Hagberg that the Iacuone case was a 50 per cent contract. The truth is I wrote the 50 per cent contract a few days after Mrs. Iacuone came to the office *23 of F.A.P. * * * To my knowledge F.A.P. wanted Frank O'Brien, Sr. hired at 1/3 of the money received from the Insurance Company in the Iacuone case but the total fee to the Iacuones was to be ½ or 50 per cent of the money received on the claim. Mr. and Mrs. Iacuone both knew that the contract was 50 per cent * * ". Facts recited in the latter part of the statement, not quoted above, relate to the Spies will controversy. The witness later emphatically denied that he was the author of the statement, though admittedly it is in his handwriting. He also denied that he ever represented that the facts therein were true, though such testimony is contradicted by the Honorable J. H. Brennan, Judge of the First Judicial Circuit, Grace A. Creamer, court reporter, the defendant, and, in part, by other witnesses. The facts recited in the statement, if true, and the testimony given by DeFranco on the first criminal trial, if true, would fully support defendant in his contentions. We think, however, no credence should be given to the facts recited in the statement, or to the other testimony of this witness. His unreliability is clearly demonstrated by the numerous differences in his testimony, as given at different times, his biased attitude as a witness, and by his several attempts to obtain immunity from prosecution as to testimony given by him in connection with the matters involved in the series of cases mentioned above, or in proceedings before grand juries, admitted by him to have been false. Of this witness the trial court, in its opinion, wrote: "DeFranco is an irresponsible witness, as demonstrated by the record in this proceeding * * * this Court has no confidence in him."
We have not attempted to state all the testimony given by each witness in each of the several proceedings mentioned. We believe the statements of witnesses quoted fairly represent the effect of the testimony of the respective witnesses as to the controlling facts. In an effort to further shorten the statement of facts, the length of which can now be justified only because of the long, continuous and numerous controversies, reference to certain facts which may be deemed pertinent will be made only in the discussion of the evidence.
We find no material difference in the views of the parties to this proceeding as to the rule of law governing the degree of proof required to sustain the charges of unprofessional conduct of an attorney, necessitating the annulment of his license to practice law. In State v. Shumate, 48 W. Va. 359, 37 S.E. 618, this Court held: "4. To disbar an attorney, the evidence of the charges against him must be full, preponderating, and clear." In State v. Smith, 84 W.Va. 59, 99 S.E. 332, this Court held: "7. To disbar or suspend an attorney the evidence of the misconduct charged against him must be full, preponderating, and clear." See In re Marcum, 135 W.Va. 126, 62 S.E.2d 705; In re Damron, 131 W.Va. 66, 45 S.E.2d 741; State v. Stiles, 48 W.Va. 425, 37 S.E. 620. The rule having been established in this State and followed over a long period of time, we need not here consider decisions of other jurisdictions. It may be noted, however, that the rule followed in this State is no more exacting as to the nature or degree of proof required to establish such charges than is required in other jurisdictions. See 5 Am.Jur., Attorneys at Law, Section 293 et seq.
In 7 C.J.S. Attorney and Client § 33, it is stated: "All proper intendments are in favor of the attorney, and reasonable doubts or conflicts in the evidence should be resolved in his favor * * * and evidence bearing the earmarks of private spite should be accepted with extreme caution and scrutinized most carefully."
A careful examination of the record reveals, we believe, that the only substantial evidence which clearly and unequivocally supports the position of the committee to the effect that the employment contract between defendant and the Iacuones provided for the payment to defendant of a contingent fee of 331/3 per cent, under the status of the action at the time it was compromised, *24 is the testimony of Mrs. Iacuone and of her brother Robert Cipriani. Strong doubt as to her recollection of the exact terms of the contract may possibly arise from the discrepancies found in her testimony, quoted above, given at different times, though such discrepancies may have occurred because of lapse of time. In considering her evidence it should not be overlooked that, at least in so far as the record is concerned, no complaint was made by the Iacuones for more than fourteen months after the settlement, and not until after Mrs. Iacuone had talked with DeFranco and after his activities had resulted in a visit by her and Mr. Iacuone to the offices of Mr. O'Brien, and after the Iacuones apparently had become convinced that defendant owed them the further sum of $2,833.33 and that they would not be required to pay any legal fees for the recovery of that sum. To say the least, the Iacuones were vitally interested witnesses. The only material testimony given by Cipriani as to the terms of the contract relates to the one supposed statement of defendant, made at the time of the settlement with the Iacuones. The making of the statement is denied by defendant, and certain statements made by the witness, in his testimony, are strongly contended by other witnesses to be incorrect, at least, which, with his admitted activities in the matters involved, and his relationship to Mrs. Iacuone, make it necessary to weigh his testimony cautiously.
Though the testimony of defendant was consistent and unequivocal, as given on the several trials, there is the same reason for examining and weighing it with great caution as exists in the consideration of the testimony of Mrs. Iacuone. We do not, of course, intend to imply that the testimony of an attorney at law in such a case as the instant one should always be disregarded or be given less weight than in other types of cases. To do so would place attorneys at the mercy of disappointed or disgruntled clients, for the attorney, often, at least, is the only person other than the client having exact knowledge of the terms of such a contract.
The testimony of Dwight H. Trushel, an attorney practicing in Hancock County, who saw the contract, unequivocally supported the position of defendant. No attack has been directed at his testimony, but it is pointed out that he had offices with defendant, was not a partner of defendant, and that each had a separate law practice. He had no personal interest in the outcome of the Iacuone action. Dolores Kozielska, a stenographer in defendant's office who saw the contract, testified on each of the three trials reported to the effect that the contract provided that defendant should receive as his fee fifty per cent of any sum recovered in the action. She has not been successfully impeached, unless the fact of her employment by defendant does so.
Forty three affidavits relating to the good reputation of defendant were made part of the record by agreement. They appear to have been made by substantial, representative citizens of the community wherein defendant resides and practices law. Though such evidence is usually admitted, and is usually obtainable, we think it not entitled to great weight in a proceeding like the instant one.
Vigorous contentions were made, especially in the criminal proceeding, to the effect that the transactions between defendant and the associate counsel point directly to the guilt of defendant. We do not understand it to be contended that an attorney is guilty of unprofessional conduct, requiring the annulment of his license, in engaging associate counsel to assist in the prosecution of an action for less than one half of the fee agreed to be paid by the client. In the first place, the amount or proportion of any such compensation is purely a question of contract between attorneys. Necessarily, such amount or proportion will usually be determined from the circumstances of each particular case, such circumstances *25 as the experience of the respective attorneys, the purpose of the employment, and the particular part of the work to be done by the associate counsel, the nature of the litigation and the state of the proceeding at the time of employment.
The agreement between defendant and associate counsel was not reduced to writing. Defendant has always insisted, and testified to such effect, that the associate counsel was to receive one half of one third of any recovery obtained from the employment. Clearly, the associate counsel was informed, at the time the check for his fee and the letter accompanying it were delivered to him, that he was paid only one half of one third of the recovery. The check and the letter clearly say so, the letter stating, "check in the amount of $3,083.33, representing one-half share of the fee of $6,166.66". He knew that the full settlement was $18,500. He indorsed the check given in payment thereof. Yet no objection or complaint was made by him until after he was informed of the dissatisfaction of the Iacuones. Nor is his testimony essentially to the contrary. On the first criminal trial his statements were "that our fees would be divided."; and that "I didn't say arrangement. I said Mr. Pietranton told me in this corner that he had a contract for fees and we would split them. I didn't ask what his contract was, nor did I ever see the contract. If there was any memorandum in his file concerning that I have no recollection of it. I returned that file to Mr. Pietranton later". It is true that in later cases he testified to the effect that he was under the impression he was to receive one half of any fee received by defendant. In the trial of the civil case, however, when being cross-examined by defendant he was asked the following question, to which he gave the following answer: "Q. Do you recollect I ever said to you I had any different contract or did I talk to you about a contract at all  percentages  at any time? A. No. The only time we talked about it was right there at the end of the jury box and you merely told me you had a contract." Such testimony makes it apparent, we think, that nothing in the record that we can depend on concerning the transaction between defendant and the associate counsel points unequivocally to the committee's theory as to the terms of the contract between defendant and the Iacuones, or establishes that defendant ever agreed to pay the associate counsel a greater part of the recovery than one half of the one third thereof. The testimony of both defendant and Mr. O'Brien appears to establish just the opposite.
It is also contended that the notations made by defendant on the check drawn by him to the order of Mr. Iacuone, quoted in full above, can be understood only as meaning that the contingent fee provided for in the contract of employment between defendant and the Iacuones was on the basis of one third of the recovery. Undoubtedly, the notations could be given that meaning. We think, however, that the meaning attributed to the notations by defendant is not so improbable as to make it unreasonable of belief. The figures given in the notations, the amounts of the different checks, are explainable under either theory of the case. Nothing that we can see in the notations points more certainly to one theory than the other. Being equivocal, the notations should not be given controlling effect, either for or against defendant. Perhaps few attorneys would make the same notations on checks given in similar circumstances. Such notations are usually brief and not intended to explain fully complicated transactions, but only to bring to memory the transactions with which they are connected.
Another argument of the committee relates to the fact that no copy of the contract of employment between defendant and the Iacuones was produced at any trial. The record is not clear as to whether a copy was delivered to the Iacuones. Defendant testified to the effect that he did not know how the contract was removed from his files, and though a thorough search of his *26 office files was made before any trial, no copy was found. There is some evidence to the effect that the contract was in the file of defendant when delivered to the associate counsel, and the associate counsel testified concerning his personal file in the Iacuone matter, that "The strange part of it is that copies of that letter and that file * * * have disappeared from my file, or the file has disappeared". No intimation is intended, of course, that the associate counsel had anything to do with the disappearance of the contract. It merely illustrates that important files and papers do become lost or misplaced. The record indicates defendant's belief that someone, not the associate counsel, who was interested in his conviction, was responsible for the absence from the file of any copy of the contract. He points out that DeFranco for some time had access to his files.
Other contentions, such as questions relating to the place where defendant delivered the checks given in settlement with Mr. Iacuone, certain telephone calls, and statements as to the bribing of an insurance attorney, are contended to support the theory of the committee. To undertake to detail the evidence as to each of such contentions appears useless. We think it would not be helpful. We have, however, examined the entire evidence relating to such contentions, and are of the view that such evidence is not so clearly preponderant, either for or against the position of the committee, as to be given controlling effect in the determination of the question as to the sufficiency of the evidence to fully and clearly establish the charges contained in the complaint of the committee.
It is strongly contended that the fact that three verdicts have been returned against defendant in the connected cases cited, two of which were criminal proceedings wherein guilt was required to be proved beyond reasonable doubt, should weigh heavily against defendant in determining his guilt or innocence of the charges contained in the complaint of the committee. In this connection, the defendant points out that a jury trying the charges contained in the indictment against him in one of the criminal cases was unable to agree on a verdict, and that he was acquitted by a jury of the charges made in connection with the Spies will. An examination of the opinions of this Court in the several cases cited, however, will clearly disclose that in none of them was the sufficiency of the evidence considered. Those cases were disposed of on questions of law, having no dependency on the weight or sufficiency of the evidence. The facts of the verdicts are parts of the record in this proceeding and, of course, we consider those facts along with other facts, but give them only the weight to which we can see they are entitled.
Finally, it is contended that the finding of the trial court as to the charges contained in the complaint of the committee is entitled to great weight. The rule referred to is a salutary one, well recognized. In Berry v. Colborn, 65 W.Va. 493, 64 S. E. 636, 638, this Court, speaking of the rule and the weight to be accorded a finding of fact by a trial court, said: "* * * While this rule is to be respected and observed, no case is governed by it that does not fall within it. The exception to it is as well established as the rule itself and the appellate court will always scrutinize the evidence and circumstances to enable it to determine whether the finding is contrary to the evidence or against conscience. We said in Hursey v. Hursey, 56 W.Va. 148, 155, 49 S.E. 367, 369, that the rule `lays no restraint upon the power of the court to make a full investigation, and careful analysis of the evidence with the view to ascertaining whether there is conflict and whether the decision rests upon findings of fact supported by substantial proof.' Of course, no such finding should stand against the great weight and preponderance of the evidence. The verdict of a jury will be set aside, if it is against the plain and unequivocal inferences, arising from admitted or established facts. *27 Chapman v. Liverpool Salt & Coal Co., 57 W.Va. 395, 50 S.E. 601; Davidson v. Pittsburg C., C. & St. L. R. Co., 41 W.Va. 407, 23 S.E. 593; Manss-Bruning Shoe Co. v. Prince, 51 W.Va. 510, 41 S.E. 907; Johnson v. Burns, 39 W.Va. 658, 20 S.E. 686". There appears to be no question that the rule loses much of its force, the principal basis of the rule ceases to exist, when it is made to appear, as in the instant case, that the trial judge did not hear or observe the witnesses testify. See Taylor v. Taylor, 128 W.Va. 198, 36 S.E.2d 601; Poling v. Bennett, 103 W.Va. 456, 137 S.E. 883; Barnard v. Barnard, 132 Va. 155, 111 S.E. 227; County of Norfolk v. City of Portsmouth, 124 Va. 639, 98 S.E. 755; Williams v. Kendrick & Reynolds, 184 Va. 1076, 37 S.E.2d 8. The finding of the trial court of a question of fact is, of course, entitled to weight. The amount of weight, however, depends on certain facts, as indicated by the authorities just cited. The fact that such a finding is entitled to weight, however, cannot relieve this Court of the duty to determine whether the finding is supported by a preponderance of the evidence or, in a proceeding like the instant one, whether the rule requiring proof of guilt to a greater degree than a mere preponderance has been satisfied. It may be pertinent to note that, to some extent, at least, the charges against defendant grow out of alleged fraud, deceit and misrepresentations. To sustain such charges, even in the usual civil proceeding, they must be "clearly and distinctly" proved. LaFollette v. Croft, 122 W.Va. 727, 14 S. E.2d 917.
Our examination of the whole evidence, and repeated examinations of material parts thereof, lead us to the conclusion that the Legal Ethics Committee has not carried the burden of proving the charges, or any one of them, contained in its complaint filed in the Circuit Court of Hancock County, to the degree required by the applicable rule. We need not say here whether the facts and circumstances tending to support a finding of guilt, together with the weight accorded the trial court's findings, constitute a preponderance of the evidence. We think the evidence falls short of the degree of proof required to establish guilt in a proceeding like the instant one. It does not amount to "full, preponderating, and clear" evidence, as required by decisions of this Court. State v. Smith, supra [84 W.Va. 59, 99 S.E. 332].
Based on our conclusions as to the evidence, and in accordance with the authorities cited, we approve our former decision herein, recall the per curiam opinion and the dissenting opinion thereto, reverse the judgment of the Circuit Court of Hancock County annulling the license of defendant to practice law, and remand the proceeding to that court, with directions to dismiss the complaint filed herein by the committee.
Reversed; remanded with directions.
BROWNING, J., did not participate in the consideration and decision of this case.