# Richmond

Otto L. Tucker v. Seventh District Committee of the Virginia State Bar.

June 12, 1961.

Record No. 5249.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*S. W. Tucker* (*Oliver W. Hill*, on brief), for the plaintiff in error.

*Francis C. Lee, Assistant Attorney General* (*A. S. Harrison, Jr., Attorney General*, on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

Otto L. Tucker, appellant, appealed as a matter of right from a judgment entered on February 9, 1960, in a proceeding under § 54-74, Code 1950, wherein he was reprimanded for violation of § 54-74(6)[1], and Canon 27[2] of the Canons of Professional Ethics. Rules of Court, Part Six, II.

Upon complaint of Mrs. Alma L. Kibler and her son, Buford L. Kibler, age 17, the Seventh District Committee of the Virginia State Bar, appellee, notified appellant in writing, pursuant to Rule 13 of the Rules for the Integration of the Virginia State Bar, that a hearing

---

[1] "§ 54-74(6) '*Any malpractice, or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct*', as used in this section, shall be construed to include the improper solicitation of any legal or professional business or employment, either directly or indirectly, or the acceptance of employment, retainer, compensation or costs from any person, partnership, corporation, organization or association with knowledge that such person, partnership, corporation, organization or association has violated any provision of article 7 of this chapter, or the failure, without sufficient cause, within a reasonable time after demand, of any attorney at law, to pay over and deliver to the person entitled thereto, any money, security or other property, which has come into his hands as such attorney; provided, however, that nothing contained in this article shall be construed to in any way prohibit any attorney from accepting employment to defend any person, partnership, corporation, organization or association accused of violating the provisions of article 7 of this chapter."

[2] "Canon 27.—*Advertising, Direct or Indirect.*—The customary use of simple professional cards is permissible. Publication in approved law lists and legal directories, in a manner consistent with the standard of conduct imposed by these Canons, of brief biographical data is permissible. This may include only a statement of the lawyer's name and the names of his professional associates, addresses, telephone numbers, cable addresses, special branches of the profession practiced, date and place of birth and admission to the Bar, schools attended with dates of graduation and degrees received, public offices and posts of honor held, bar and other association memberships and, with their consent, the names of clients regularly represented. This does not permit solicitation of professional employment by circulars, or advertisements, or by personal communications or interviews not warranted by personal relations. It is unprofessional to endeavor to procure professional employment through touters of any kind. Indirect advertisements for professional employment, such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible."

would be held August 22, 1959, on the complaint which charged that appellant violated Canon 27 of the Canons of Professional Ethics by soliciting employment as counsel for Buford Kibler from him and Mrs. Kibler. At the hearing appellant appeared in person and by counsel. Evidence and argument of counsel were heard and a decision was deferred for further study by the Committee. It later decided that disciplinary action was merited, giving as the reason appellant "solicited the account from Buford L. Kibler".

On October 23, 1959, the Committee filed its "Report and Complaint", verified by affidavit, in the Circuit Court of Warren County in which further proceedings were suggested. Attached to the complaint as exhibits were sworn statements of Mrs. Kibler and her son, Buford, and a copy of the notice to appellant of the Committee's hearing. Appellant filed exceptions to the report and complaint. At a hearing had on November 2, 1959, the exceptions were overruled, and appellant was ordered to appear on December 21, 1959, before the court and show cause why his license to practice law should not be revoked or suspended. On November 24, 1959, appellant filed motions to dismiss the rule and for a bill of particulars. The bill of particulars and appellant's answer to the rule were filed in open court on December 21, 1959, and the court proceeded to hear evidence and argument of counsel. After deliberating the court, composed of three experienced judges, reached the following unanimous conclusion, which was read in open court and later incorporated in the order entered February 9, 1960:

"Virginia Code Section 54-74(6) and Canon 27 of The Canons of Professional Ethics promulgated by The Virginia State Bar impose upon all Attorneys at Law in Virginia a high standard of professional conduct with respect to the solicitation of professional employment.

"Under our conception of these provisions an attorney should carefully abstain from any word or act which might tend to influence any person toward a decision to retain his services. We think this is true although such person might be without funds to retain an attorney of his own, especially since the court is required to provide counsel for all indigents charged with felony. Nor do we believe that the fact that an attorney is retained by several other persons implicated in the offense with which the subject was charged would give such attorney the right to volunteer his services.

"In this case, after careful consideration, we are of the opinion that the respondent's conduct violated the said Statute and Canon.

"However, we have taken into consideration that the respondent's reputation for professional conduct in the past is good, and also the fact that the motive for solicitation was not so much personal gain, of which there was little hope, as a desire to serve his other clients efficiently.

"Accordingly, we feel that no suspension of the right to practice law is justified, and that the ends of justice will be met by an official reprimand, and it will be so ordered."

The undisputed facts are as follows: Buford Kibler was being detained in Warren county jail on a charge of felonious assault as one of a mob. At the time he was on probation for housebreaking. Appellant was admitted to the bar in 1946 and has practiced law since that time. He had been employed to represent other defendants involved in the assault. On June 22, 1959, unsolicited, he visited Kibler, whom he had never met, at the jail, made known his name and profession as well as the names of his clients, and discussed the case. During the course of the interview Kibler wrote a note to his mother on appellant's yellow pad which said: "Mom. Please give Otto L. Tucker permission to represent me. Thanks. Buford Kibler." Before leaving appellant gave his professional card to Kibler. While at the jail he interviewed other defendants he had been engaged to represent. About 3:30 in the afternoon appellant contacted Mrs. Kibler at her residence and exhibited the note and she informed him that he would have to talk with her husband. Appellant returned later in the day, but Mr. Kibler was not there. At the preliminary hearing he saw Mr. Kibler in the corridor outside of the courtroom and Mr. Kibler remarked: "I don't think I want you to represent him", to which appellant replied "very well" and continued walking. Kibler was represented at the trial of the case by John F. Ewell, a court appointed attorney.

According to Buford Kibler he had never discussed employment of counsel with anyone prior to appellant's visit with him at the jail. He was asked by appellant whether he had a lawyer and he answered in the negative because his father could not afford to employ one. He said appellant offered to represent him if his parents approved. When asked whose idea it was to write the note to his mother, he replied: "Well, I guess it was both of us. I guess I would have been willing to write the note." On direct examination he testified:

"Q. What did you talk about mostly while you were there? While he was with you?

"A. Well, different things. We talked about representing us and about the pay, and things like that.

"Q. What did you talk about in regard to the pay?

"A. Well, he said we would work that out later. I told him we didn't have enough money to pay him, and he said we would work that out later.

"Q. Did he say how you would work it out later?

"A. No, sir.

"Q. Did you talk about the charge that was against you at that time?

"A. Just a little. Not much about the case.

"Q. What did you talk about mostly, while he was there?

"A. Well, I don't know.

"Q. Well, in regard to whether or not he would represent you, or in regard to the facts in the case. What did you discuss the most between those two things?

"A. You mean which one of them was discussed the most?

"Q. Yes.

"A. Well, about representing me."

Mrs. Alma Kibler stated she had never seen appellant before he came to her residence with the note from her son and introduced himself as an attorney from Alexandria. She testified on direct examination:

"Q. Did he show you this note at that time?

"A. Yes, sir, he did.

"Q. What else did he say to you?

"A. Well, he just said—he showed me this note, and he said if I wanted him to represent him, sign underneath the note.

"Q. Sign underneath this note?

"A. Yes, sir.

"Q. Did you sign your name?

"A. No, sir, I didn't sign anything.

"Q. Why didn't you?

"A. Well, I don't think that he should have done it, that's why.

"Q. Did he mention what it would cost?

"A. He says, 'I'll tell you like I told the rest, $300.' "

Mrs. Kibler said she told appellant he would have to see her husband as she "couldn't tell him anything". Later that afternoon Mrs. Kibler and her husband went to the sheriff's office where she said she

talked to Sheriff Slaughter and told him about appellant's visit to her home concerning her son's case.

Gathaline Kibler, daughter of Mr. and Mrs. Kibler, was present during the conversation appellant had with her mother. She testified:

"Q. Did he make any statement about wanting to represent your brother, Buford?

"A. Yes, sir. He said that he had a note from my brother to show mamma, and he said if she wanted him to represent my brother, all she would have to do would be to sign that note.

"Q. Did he make any statement of what it would cost?

"A. I think he did.

"Q. What did he say?

"A. He said he would tell her like he told all the rest, the fee would be $300."

Appellant testified that his purpose in talking to Kibler was to ascertain his version of the incident which gave rise to the charges placed against the co-defendants he had been engaged to represent; that after introducing himself he informed Kibler of the persons he represented and asked his version of the incident; that Kibler related some of the things that happened and then asked appellant if his probation on a previous charge of housebreaking would be revoked; that he then inquired if he had an attorney, to which Kibler replied he did not; that his purpose in asking if he had a lawyer was to advise him to consult his attorney as that was "his business, not mine", and that he in an effort to alleviate Kibler's mind told him it was best that he be concerned about the present case, because the outcome of it would determine whether or not his probation would be revoked. He further stated that he attempted to draw Kibler's attention back to the present case as he had come to interview him as a witness; that again the discussion drifted to his problem of probation and he then suggested that Kibler retain a lawyer; that Kibler informed him his parents were financially unable to do so and indicated his desire to have appellant represent him, and that he was asked what fee he was charging other co-defendants and he replied $300.

Appellant further said that he was impressed with the idea that Kibler and his parents were without money and could not retain counsel; that he told Kibler he "would represent him anyhow"; that he informed Kibler, who was a minor, if he wanted him to be his counsel to write a note to his parents making such a request; that he was asked what to write and he replied: "Well, you know what to

write your own mother. Just ask to give me permission to represent you"; that soon after his conference with Kibler he informed the parents of other defendants he represented that he might also represent Kibler as he was a good witness, and that his "idea was to represent him for free, but I didn't want these parents, those that I was charging a fee, to feel that I was being unjust to them."

Appellant stated that he then went to Mrs. Kibler's residence and told her that her son, Buford, had informed him that he would like for him to be his counsel and he gave her the pad with the note on it; that Mrs. Kibler advised him that she could not tell him anything until her husband came home; that money was not discussed, and that he did not request her to sign a contract or the note which he exhibited.

John Downing, Sr., father of one of the defendants represented by appellant and who was called as a witness for appellant, testified on cross-examination:

"Q. Mr. Downing, you state that the first time you saw him [appellant] was on the morning of the 22nd, when he came here to discuss the representation of all of you?

"A. Yes.

"Q. And the idea was for him to go up to the jail and talk to Kibler and see if he could represent him, too?

"A. I didn't say he went up to the jail to talk to Kibler? There was another boy, two more boys there, at the time.

"Q. But you talked to all of them?

"A. To get them all.

"Q. The idea was to represent them all?

"A. The idea was, yes."

The principal question for us to decide is whether the evidence adduced is sufficient to sustain the judgment of the court below that appellant's conduct was in violation of § 54-74(6), Code 1950, and Canon 27 of the Canons of Professional Ethics.

■ A proceeding of this kind is merely civil in nature and not criminal. Hence it is not necessary to prove appellant's guilt beyond a reasonable doubt in order to justify the court's action. *Campbell* v. *Third Dist. Comm.*, 179 Va. 244, 249, 18 S. E. 2d 883.

■ The record shows that appellant sought and obtained an interview with Kibler while he was incarcerated; that the interview was not solicited by Kibler or anyone for him, and that they had never seen each other prior to the visit. Appellant stated his purpose in

visiting Kibler was to consult him as a witness. Assuming that to be true, his consultation was not confined to his stated purpose. It resulted in his offer to represent Kibler along with other defendants, and a note was secured from him asking his mother's consent which appellant took in person to Mrs. Kibler. There was evidence appellant expected to receive a fee for his services. Even if Kibler was a witness for appellant's clients, he could have stood on his constitutional rights and refused to testify since he was also a defendant. Moreover, being a witness did not establish personal relations between appellant and Kibler. Upon consideration of the record before us, we hold that there was sufficient evidence to support a finding that appellant's conduct amounted to improper solicitation of professional employment by personal communication not warranted by personal relations, which violated both the letter and the spirit of § 54-74(6), Code 1950, and Canon 27 of Canons of Professional Ethics. The trial court, which heard the evidence *ore tenus*, did not err in finding that these provisions had been violated.

Appellant contends the trial court's judgment that his conduct was unlawful or unethical was in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States in that "the court has denied the equal right of an indigent accused to be represented by his choice of counsel available to him and the correlative right of an attorney to volunteer his professional services to such indigent accused."

In the first place, the court did not deny Buford Kibler the right to be represented by appellant at the trial of his case. According to appellant, Buford's father stated to him prior to the trial "I don't think I want you to represent him" and appellant replied "very well". In the second place, no constitutional rights of Kibler were violated because he was afforded representation at the trial of his case by a competent court appointed attorney. But if we assume Kibler's constitutional rights were violated, appellant is in no position to raise the question. We said in *Grosso v. Commonwealth*, 177 Va. 830, 839, 13 S. E. 2d 285.

"It is well settled that one challenging the constitutionality of a provision in a statute has the burden of showing that he himself has been injured thereby. It avails him nothing to point out that some other person might conceivably be discriminated against."

As has been said, appellant had no right to improperly solicit professional employment. That being true, there can be no violation

of the Constitution securing to him a right he does not possess. We find that no constitutional rights of appellant have been violated.

We conclude that the evidence was sufficient for the trial court to reprimand him for his conduct.

The judgment appealed from is

*Affirmed.*