# Richmond

## JOHN MADDY v. FIRST DISTRICT COMMITTEE OF THE VIRGINIA STATE BAR.

November 30, 1964.

Record No. 5783.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*William C. Worthington* (*Worthington, White & Harper*, on brief), for the plaintiff in error.

*Francis C. Lee, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

■ John Maddy, an attorney at law, was found guilty of unprofessional conduct by a duly constituted three-judge tribunal, and his license to practice law was ordered suspended for a period of six months. He appealed that judgment as a matter of right. Code, § 54-74.

Pursuant to Rule 13 of the Rules for the Integration of the Virginia State Bar, the First District Committee of the Virginia State Bar notified Maddy in writing that it had received complaints of unprofessional conduct on his part and that in the opinion of the Committee the complaints justified and required further investigation. The notice set forth eight specific charges (hereinafter referred to as counts) of alleged unprofessional conduct. Maddy appeared in person and by counsel at the Committee hearing held on April 9, 1962. After considering the evidence and argument of counsel the Committee dismissed count No. 6 and unanimously decided that the remaining seven counts merited disciplinary action.

On June 11, 1962, the Committee filed its "complaint", verified by affidavit, in the Circuit Court of the City of Hampton for further proceedings. Maddy was directed to appear before the court and show cause why his license to practice law should not be revoked or suspended or why any other disciplinary action should not be taken. Upon motion duly made at the hearing, which was held on June 5, 1963, counts No. 1 and 2 were dismissed by the court, but Maddy was found guilty of unprofessional conduct on the five remaining counts, which appear in the margin.[1]

---

[1] "3. That you did accept employment to represent Robert E. Post in a divorce and bankruptcy matter and did accept and receive payment of all fees to be paid ·pursuant to said contract of employment, and did not perform said contract for an unreasonable period of time; that although Robert E. Post demanded return of the fees paid to you, you did fail to return said fees until 8 September 1961 immediately prior to a hearing of the First District Committee concerning the complaint of Robert E. Post.

"4. That you did accept employment to represent Gloria Marie Holstein Harrelson in a divorce matter and did accept and receive payment of all fees to be paid pursuant to said contract of employment, and did not perform said contract for an unreasonable period of time; that you did that which you were employed to do only after your client had reported your conduct to the Court and the Judge thereof demanded that you perform said contract.

"5. That you did accept employment to represent Albert Johnson in a divorce

Maddy's sole assignment of error is that the court's decision was contrary to the law and the evidence. He contends that the evidence was insufficient to support the several charges lodged against him. He concedes, however, that if it be determined that certain testimony of Judge Kearney, which he objected to, was admissible, "the evidence was sufficient to show unreasonable delay in the handling of the Johnson and Northcutt cases." (counts No. 5 and 7). He also contends that, under the circumstances of this case, a reprimand would be "a more appropriate punishment" rather than a suspension of his license to practice law for a period of six months. On the other hand, the Committee takes the position that the evidence clearly establishes a pattern of unprofessional conduct on the part of Maddy and that the judgment appealed from should be upheld.

"A proceeding of this kind is merely civil in nature and not criminal. Hence it is not necessary to prove appellant's guilt beyond a reasonable doubt in order to justify the court's action." *Tucker* v. *District Committee,* 202 Va. 840, 846, 120 S. E. 2d 366. See also *Campbell* v. *Third Dist. Comm.,* 179 Va. 244, 249, 18 S. E. 2d 883; *Norfolk Bar Ass'n* v. *Drewry,* 161 Va. 833, 837, 843, 172 S. E. 282.

"It is an informal proceeding and it is only necessary that the de-

matter and did accept and receive payment of all fees to be paid pursuant to said contract of employment, and did not perform said contract for an unreasonable period of time; that you delivered a draft of a final divorce decree to the said Albert Johnson and represented to him that the Court had entered said draft as a final decree, knowing that said decree had not been entered by the Court; that you did that which you were employed to do only after your client had reported your conduct to the Court and the Judge thereof demanded that you perform said contract.

\* \* \* \* \*

"7. That you did accept employment to represent Douglas William Northcutt in a divorce matter and did accept and receive payment of all fees to be paid pursuant to said contract of employment, and did nothing in performance of said contract for an unreasonable period of time; that you did that which you were employed to do only after your client had reported your conduct to the Court and the Judge thereof demanded that you perform said contract.

"8. That you failed to pay your 1961 Virginia State Bar dues within thirty days after notice of delinquency was given you by registered mail by the Secretary-Treasurer of the Virginia State Bar whereupon notice was given to the Judge of the Circuit Court of Hampton, Virginia by said Secretary-Treasurer that you were not licensed to practice law; that on March 8, 1961, you wired a Western Union Money Order to said Secretary-Treasurer in payment of said dues and fraudulently promised R. E. Booker, said Secretary-Treasurer, that you would pay the cost of a telegram from R. E. Booker to the Judge of the Circuit Court of Hampton, Virginia, notifying said Court of said payment; that said R. E. Booker relying upon your promise as aforesaid sent said notice by telegram as requested by you, but that you failed to pay for said telegram until R. E. Booker preferred charges for fraud against you to the First District Committee of the Virginia State Bar."

fendant be informed of the nature of the charge and be given an opportunity to answer." (Citing cases.) *Norfolk Bar Ass'n* v. *Drewry, supra,* at p. 838.

In the view we take of this case, it will serve no useful purpose to discuss in detail the evidence pertaining to each of the counts of which Maddy was found guilty by the court below. Suffice it to say that upon a consideration of the entire record we are of opinion that there was sufficient evidence for the court to find Maddy guilty of unprofessional conduct.

Albert Johnson's complaint against Maddy was indeed a very serious one. The evidence was conflicting, but the court accepted the evidence presented on behalf of the Committee, which it had a right to do. It showed that Johnson retained Maddy to secure a divorce for him. The agreed fee was paid in installments, and final payment was made in September, 1954. The bill of complaint was filed on March 4, 1954. According to Johnson, Maddy gave him a typewritten paper which was represented by Maddy to be a copy of his divorce decree, but Johnson later ascertained that a decree of divorce had not been entered. He testified as follows:

"Q. What happened thereafter, Mr. Johnson? [after making initial payment on the fee.]

"A. Well, he went on with my divorce and he gave me a copy of a divorce, I guess, which I thought was all right.

\* \* \* \* \*

"Q. How much longer after you originally went to see him do you recall this paper being given to you?

"A. I don't know whether it was a couple of weeks or a month or more, but anyway, when I went back to see him, he told me that the paper was all right. He said, 'Just don't listen to some other talking.'

"Q. Had he given you this paper before? Why did you go back to see him?

"A. The reason I went back to see him was because this friend of mine, J. W. Northcutt, which is here now, he was working down here at this barber shop and I stopped by and showed him the paper and he said-

"Q. This paper, was this given to you by Mr. Maddy?

"A. Yes, sir.

"Q. What was this paper supposed to be?

"A. Supposed to have been my divorce.

"Q. What transpired after you talked with Mr. Northcutt?

"A. Well, he told me, 'I have got the same piece of paper.' He said, If I got the same piece of paper and mine read the same way, the thing wasn't no good.

"Q. Did you go see Mr. Maddy after that?

"A. Yes. I goes back to see Mr. Maddy again about it and he told me that the paper was all right. He told me I was just listening to a lot of rumors here and there.

"He told me the paper was all right, as far as I can remember now. That is what he told me; the paper was all right.

"Q. What did you do after that?

"A. Well, I kept going. I think I went back to him a couple of times after then and he asked me what I was worried about. I told him I was worried about the paper not being right because a lot of my friends told me the paper wasn't right.

"The next time I decided not to go see him no more. I went to see Judge Kearney. That is when this come up.

\* \* \* \* \*

"Q. What did Mr. Maddy say to you at the time he gave you the paper you have reference to?

"A. He told me it was my divorce."

Johnson contacted Judge Kearney and exhibited the paper given him by Maddy. Judge Kearney examined it. He stated that it was styled, but did not contain a heading or a signature and appeared to be an office copy of an absolute divorce decree. Judge Kearney testified:

"Q. After you had your conversation with him [Johnson] the second time, that morning what occurred? What did you do?

"A. I think I told him to come back. When he came back I called Mr. Maddy and Mr. Maddy came on up and when I walked out of my office, I found Mr. Maddy out there talking to him and I told Mr. Maddy that I would rather for him not to talk to him. He said, 'He is my client.' I said, 'Yes, he is your client and he has a complaint against you.'

"He said, 'The man is undependable. You can't believe anything he says.' I said, 'I will tell you I believe what he told me. The first thing is why did you give him this copy of the decree? You knew it hadn't been entered,' and in the meantime, I went downstairs in the clerk's office and I found out all that had been done down there. The bill had been filed. Wasn't any deposition or notice of any kind.

"I told Mr. Maddy, 'What are you doing, giving him a copy of a decree that hasn't been entered?' In the meantime, this man said that Mr. Maddy had given him the decree about seven or eight weeks before he was over there.

"He wanted to get married and showed his prospective bride, and she questioned it. She said, 'It ain't got no seal on it. It ain't no good.' That is why he came to see me, so he told me.

"Mr. Maddy and I and Johnson had a little further discussion and I told Maddy that I didn't appreciate his giving him the decree. I said, 'Why did you give him the decree?' He said, 'Just to let him know I am working on his case and this was the decree that was going to be entered.'

"Q. Going to be entered?

"A. That's what he told me. Twenty-one days after it was entered, it would be final. I said, 'I will tell you that you haven't taken any depositions. You haven't done anything in this thing and I don't think you should give this man a decree. I believe you told him this was a divorce decree.' Mr. Maddy denied that."

Thereafter, about December 31, 1954, Maddy filed depositions which had been taken on March 31, 1954. He stated that the reason they had not been previously filed was because the notary public left his employ without signing the verification of testimony; that he did not secure her signature until December 31, 1954, and that "I was just, frankly, a little slow getting around to it." The court rejected these depositions. Later, another set of depositions was rejected for failure to give notice. Finally, a third set of depositions was submitted, and a decree of divorce *a vinculo matrimonii* was entered March 28, 1955.

Maddy testified that he did not tell Johnson that the paper he typed was a divorce decree; that Johnson was worried about the possibility of having to pay "support money" for his wife; that he showed Johnson a copy of a decree in a case similar to his where no "support money" was allowed, and that Johnson requested him to "write something up similar to that for him". He said that he complied with the request and advised Johnson that "it is of no value".

Unquestionably, the evidence on behalf of the Committee was sufficient to support a finding that Maddy's actions in his dealings with Johnson amounted to unprofessional conduct.

█ Maddy objected to the court's actions in permitting Judge Kearney to testify as to certain conversations he had with Maddy and

also those he had with Gloria Harrelson, Albert Johnson and William Northcutt, clients of Maddy, concerning their complaints. It is contended by Maddy that such conversations were hearsay evidence whose admission constituted prejudicial error.

As has been stated, disbarment proceedings are informal. They are not criminal, but merely civil in nature. They are "special proceedings, peculiar to themselves, sui generis, disciplinary in nature, and of a summary character, * * *. Such a proceeding is not a lawsuit between parties litigant, but is rather in the nature of an inquest or inquiry as to the conduct of the respondent." 7 C.J.S., Attorney and Client, § 28, p. 771.

The judge merely repeated what he had said to Maddy and what Maddy had said to him. His testimony as to conversations he had with Maddy's clients simply confirmed in part the testimony of those witnesses. We hold that the admission of this evidence did not constitute prejudicial error.

█ Finally, Maddy contends that, under the circumstances, the court should have reprimanded him instead of suspending his license to practice law for a period of six months.

In 7 C.J.S., Attorney and Client, § 38, p. 806, it is said:

"In arriving at the punishment to be imposed, precedents are of little aid, and each case must be largely governed by its particular facts, and the matter rests in the sound discretion of the court. The question is not what punishment may the offense warrant, but what does it require as a penalty to the offender, as a deterrent to others, and as an indication to laymen that the courts will maintain the ethics of the profession. * * *" See also 5 Am. Jur., Attorneys at Law, § 253, p. 413.

It is fair to state that a number of reputable attorneys and substantial citizens testified that Maddy's reputation was good in the community where he resides and practices his profession. But this is not controlling or entitled to great weight in a proceeding of this nature. *State Bar* v. *Pietranton*, 143 W. Va. 11, 27, 99 S. E. 2d 15. It is very likely that the court gave consideration to this testimony in arriving at its decision.

Maddy emphasizes that none of his clients suffered "any prejudice to his legal rights" as a result of his delay. But, assuming that to be true, it is not enough to exonerate him. In disbarment proceedings it is not necessary to show that an attorney's actions prejudiced his client's legal rights.

Under the evidence adduced, we cannot say that the court abused its discretion in suspending Maddy's license to practice law for a period of six months.  A determination that he was guilty of unprofessional conduct in representing Albert Johnson (count No. 5) is, by itself, sufficient to justify the court's action.

For the reasons stated, the judgment appealed from is

*Affirmed.*