COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Ortiz and Chaney
Argued at Richmond, Virginia


SCOTT J. ROBERTS, P.T.

MEMORANDUM OPINION* BY
v.        Record No. 1325-24-2                    JUDGE DANIEL E. ORTIZ
                                                  JANUARY 27, 2026

VIRGINIA BOARD OF PHYSICAL THERAPY


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Richard S. Wallerstein, Jr., Judge

Rachel L. Yates (Law Office of Rachel Yates, PLLC, on briefs), for
appellant.

M. Brent Saunders, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General; Allyson K. Tysinger, Senior Assistant
Attorney General; Robert B. Bell, Deputy Attorney General, on
brief), for appellee.


The General Assembly granted the Virginia Board of Physical Therapy (the "Board")

broad powers to sanction physical therapists who engage in "unprofessional conduct" including

acts of a sexual nature or those likely to cause harm to the public.  *See* Code §§ 54.1-3480(B)(3),

(4), -3483(7), (10).  Using these powers, the Board suspended Scott Roberts's physical therapy

license indefinitely "for a period of not less than two years."  On appeal, Roberts presents three

assignments of error challenging the factual and legal findings made by the Board as well as the

severity of his sanction.[2]  Given the deferential standard of review afforded to administrative

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Roberts's second assignment of error challenges the correctness of the circuit court's
decision to bar him from relitigating the findings and conclusions of law established by the

agencies on appeal, the circuit court did not err upholding the Board's findings of fact, conclusions of law, or sanction. Consequently, we affirm.

BACKGROUND

*The Enforcement Division of the Virginia Department of Health Investigates Roberts*

In February 2022, the Enforcement Division of the Virginia Department of Health Professions investigated allegations that Roberts performed unauthorized pelvic floor therapy[3] on patients A and B and engaged in inappropriate behavior while treating Patient C. Following the investigation, the Board suspended Roberts's physical therapy license pending a formal hearing under Code § 54.1-2408.1.

*The Board's March 9, 2022 Hearing*

On March 9, 2022, the Board heard testimony from Roberts, three former patients, and various other practitioners and witnesses.

Patient A testified that in March 2021, she began receiving dry needling and deep tissue massage from Roberts for treatment of a lower back injury. On her third visit, Roberts "pulled down [her] sweatpants without telling [her] what he was going to do" and then did "dry needling" and "massaged the area on [her] left buttocks." On the fourth appointment, Patient A said that the same thing happened again, without warning. In hindsight, Patient A stated that "obviously" Roberts had to remove her pants to reach the treatment area, but she was "surprised," "frightened," and "not very happy about how that felt."

Patient A testified that throughout her treatment sessions with Roberts, he recommended pelvic floor therapy. Despite her previously declining pelvic floor treatment, Roberts continued

_____

March 27, 2023 order during his second appeal. We find that Roberts did not preserve his second assignment of error. Thus, it is waived.

[3] Pelvic floor therapy refers to treatment of the muscles in the pelvis and involves strength training exercises, stabilization techniques, and at times inter-vaginal manual therapy.

to recommend the procedure and described the process in detail, stating that "while inside" another patient, "he could feel the stress in her life." Patient A testified that she was "appalled at the intimacy of this revelation."

Patient A testified that during what would be her final appointment with Roberts, he had her lie on her back while he stood at the foot of the table. Then, "out of the blue," Patient A said, "[she] felt like two fingers on the top of [her] vaginal opening." Patient A stated that Roberts "moved his hands to the left side of [her] groin and proceeded to massage [her] groin with vigor" in a manner that felt "very, very uncomfortable." Patient A noted that Roberts never sought her permission to touch her pubic area, and nobody else was present during the incident. Reflecting on the visit, Patient A testified that she considered it a violation of her person and deeply inappropriate. After the incident, Patient A described feeling pain, and she could not complete her physical therapy exercises because her "brain was in a fog." Upon arriving home, Patient A disclosed the incident to her husband. Mr. A, Patient A's husband, corroborated his wife's testimony.

Roberts's recollection of the events differed. When discussing Patient A, Roberts testified that he only raised the possibility of pelvic floor therapy once, as she had mentioned struggling with incontinence. Roberts stated that he did perform work on Patient A's pelvic bone during her last visit but said that the treatment was "the same treatment [he] did on the first visit" where he went "on the pubic bone to do the fascial point to get it to release." Roberts indicated that he always explained the type of treatment he was going to perform but noted that he is "soft spoken" and at times Patient A could not hear him.

Next, Patient B, a registered nurse practitioner, testified. During her first visit, Roberts told Patient B that "he could tell by the way [she was] standing" that she had pelvic floor dysfunction. Patient B commented that she had experienced pelvic floor dysfunction before, but

that she was only there for treatment of her neck. Lynn Gufeld, LNP, the referring medical provider, testified that soon thereafter, Roberts sent her a progress note with a request for a prescription for pelvic floor therapy. Ms. Gufeld found the request surprising as pelvic floor therapy was not indicated by Patient B's charts, nor the reason for the referral. In response, Ms. Gufeld asked if she was interested in pelvic floor therapy. Patient B responded "no."

During another visit, Roberts entered Patient B's exam room and asked her if she "was in the mood to do pelvic floor therapy," intimating the treatment could help her with painful intercourse. Patient B told Roberts that she never mentioned painful intercourse, nor requested treatment for it, and reiterated that she was not interested in pelvic floor therapy. Roberts proceeded to dry needle her neck, but at one point, he pushed Patient B's groin and "tried to do some manipulation of pelvic over [her] clothes" and touched her "pubic." Roberts told Patient B that the "cervical region can be connected to your pelvic" region. Patient B responded by stating that she was "not interested in pelvic floor therapy." She found the whole encounter "upsetting."

As Patient B prepared to leave, Roberts told her that she was "not done yet." He left the room and sent in Cristina DiNunzio, a female physical therapist, to discuss pelvic floor therapy. Patient B explained that she was not interested in pelvic floor therapy, and she left the office. DiNunzio testified that there was no prescription for Patient B and she did not believe Patient B needed pelvic floor therapy.[4] Patient B testified that after this incident she felt extremely uncomfortable and never returned for further treatment. She noted that, because of her background in nursing, she knew that treatment was not necessary, but others may not.

After her last visit, Patient B filed a complaint with the Department of Health Professions regarding Roberts's practice. Soon thereafter, Roberts's office began calling Patient B about

---

[4] DiNunzio also testified that Roberts performed pelvic floor therapy in a manner inconsistent with her training. Roberts did not contradict this account but rather challenged DiNunzio's credentials.

unpaid medical bills. Patient B informed the receptionist that she filed a complaint against Roberts because she was upset with what he had done and did not "want him hurting anybody." Roberts then sent Patient B a cease-and-desist letter. In it, Roberts alleged Patient B's statements to staff and her complaint to the Department of Health Professions were "actionable" and "constituted defamation per se" and that "failure to comply with this cease-and-desist demand, will leave no other alternative but to pursue all available legal remedies." Patient B testified that the letter made her feel "threatened," "upset," and "angry."

At the hearing, Roberts testified that he continued to bring up pelvic floor therapy with Patient B because he heard that she was asking other therapists about how pelvic floor therapy could be connected to the condition for which she sought treatment. Roberts stated that he only sent a "script" to Lynn Gufeld for pelvic floor therapy based on his "objective findings." As to Patient B's last visit, Roberts noted that she became agitated with her lack of improvement and asked what else could be tried. It was then that Roberts decided to place his hand on her pubic bone to complete fascial point treatment. Roberts believed that Patient B would be more comfortable with a female provider, so he asked DiNunzio to come into the room. Roberts testified that he entered a discharge note in Patient B's file to document her complaint on March 25, 2020. Roberts testified that although he was aware of the complaint and Patient B's unpaid bill, the cease-and-desist letter had "nothing to do with the bill it had to do with slandering and defaming [him] to [his] employees."

Finally, Patient C testified. She stated that she began receiving treatment from Roberts in 2011. Roberts performed rectal work on Patient C and began vaginal work in 2018. Between 2011 and 2018, Patient C received pelvic floor therapy approximately fifteen times. During her last appointment, Patient C testified that Roberts began treatment like normal by releasing trigger points vaginally, but after failing to reach one spot, Roberts acted "differently." He started

making a "really fast jiggling motion" that "felt like masturbation" and made her "uncomfortable." Patient C explained that no female physical therapist had ever performed this treatment "internally" on her before. Roberts corroborated Patient C's account of the technique but characterized it as necessary to release a trigger point.

After this, Patient C did not return to Roberts. Unlike Patient A and B, Patient C did not file a complaint. Instead, she relayed the incident to her new pelvic floor therapy practitioner and the practitioner reported the incident.

*The March 15, 2022 Board Decision Suspending Roberts's License*

Following the hearing, the Board unanimously voted to suspend Roberts's license "indefinitely for a period of not less than two years." On March 15, 2022, the Board issued an order (the "First Board Order") with eight findings of fact and four conclusions of law.[5] The Board held that: Roberts violated the regulations governing the practice of physical therapy by engaging in sexual contact and unprofessional conduct that caused or was likely to cause injury to three of his female patients; conducted practice in a manner likely to be a danger to the health and welfare of his patients or the public; and performed pelvic floor therapy, an "invasive procedure," without a referral or informed consent. Roberts appealed the First Board Order to Henrico County Circuit Court.

*Roberts's First Appeal to Henrico County Circuit Court*

Roberts challenged both the sufficiency of the evidence and the Board's legal conclusions on appeal. After briefing and oral arguments, the circuit court issued an opinion on February 23, 2023, subsequently memorialized in a "Final Order" entered March 27, 2023. The circuit court found that seven of the findings of fact were supported by the record and two of the conclusions

---

[5] The factual findings and legal conclusions have not been quoted verbatim for brevity. However, the relevant factual findings Nos. 2(a), 2(d), 2(h), 2(g), 4, and 5, and conclusions of law Nos. 1 and 4, are recited below in the analysis section.

of law were proper. The court determined, however, that no regulation classified pelvic floor therapy as an "invasive procedure," and so it could not trigger heightened statutory and regulatory consent requirements before its performance. As a result, the court overturned that finding of fact and its corresponding two conclusions of law. The court found that it could not determine what weight to give the upheld factual findings and conclusions of law. Therefore, it remanded the case to the Board "for determination of the appropriate sanction that should result from the upheld Findings of Fact and Conclusions of Law." Neither party attempted to appeal the order to this Court.

*The Board's June 26, 2023 "Special Meeting"*

Following remand, the Board convened a five-member panel to determine Roberts's sanctions in light of the circuit court order. After argument, the Board voted unanimously to suspend Roberts's license indefinitely for a period of not less than two years, effective March 15, 2022. The Board issued an order ("Second Board Order") describing its decision, noting that the findings upheld in the March 27, 2023 circuit court order warranted reinstatement of the original sanction.

*Roberts's Second Appeal to Henrico County Circuit Court*

Roberts appealed the Second Board Order and characterized the Board's sanction decision as "arbitrary and capricious." Specifically, Roberts took issue with the Board using the upheld findings of fact and conclusions of law from the March 27, 2023 court order to justify reinstating the original sanction.

After argument, the circuit court issued an opinion upholding the Second Board Order. The opinion noted that "[a] full hearing was previously held [in this court], and no appeal was taken from this [c]ourt's ruling." As such, the court concluded that Roberts was "precluded from relitigating the findings that serve[] as the basis of this [c]ourt's first decision."

- 7 -

Roberts did not object to the court's finding that he was barred from *relitigating* the factual findings and conclusions of law from the March 27, 2023 order. Instead, he listed objections related to the sufficiency of the evidence supporting the factual findings made in the March 27, 2023 order, the court's decision to uphold the Second Board Order, and general objections to the Board's actions as outside of its statutory authority. Roberts timely appealed.

STANDARD OF REVIEW

"Appellate review of an administrative agency's decision is limited." *PharmaCann Va., LLC v. Va. Bd. of Pharm.*, 77 Va. App. 208, 220 (2023). Whether in a circuit court or this Court, the Virginia Administrative Process Act, Code § 2.2-4027, requires that

> the party complaining of agency action . . . designate and demonstrate an error of law subject to review by the court. Such issues of law include: (i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidentiary support for findings of fact.

*Va. Bd. of Med. v. Zackrison*, 67 Va. App. 461, 474-75 (2017) (alteration in original) (quoting Code § 2.2-4027). When reviewing an agency action under the VAPA, both the circuit court and this Court follow "familiar principles." *Id.* at 475. "[T]he duty of the court with respect to issues of fact shall be to determine whether there was substantial evidence in the agency record to support the agency decision." Code § 2.2-4027. When an appeal presents factual issues, "this Court 'defer[s] to the agency just as we would a jury or a trial court.'" *City of Virginia Beach v. Va. Marine Res. Comm'n*, 70 Va. App. 68, 73 (2019) (alteration in original) (quoting *Citland, Ltd. v. Commonwealth ex rel. Kilgore*, 45 Va. App. 268, 274 (2005)). And like any finder of fact, when credibility is an issue, the determination of the witness's credibility is within the

administrative agency's purview. *Goodyear Tire & Rubber Co. v. Pierce*, 5 Va. App. 374, 381 (1987). If the circuit court found that "there was substantial evidence in the agency record to support the agency decision," this Court will not overturn the Board's factual findings. Code § 2.2-4027.

In contrast, the duty of this Court with "respect to issues of law shall be to review the agency decision de novo." Code § 2.2-4027. "We are, however, deferential to legal conclusions reached by an agency when 'the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly.'" *Zackrison*, 67 Va. App. at 475 (quoting *Evelyn v. Commonwealth Marine Res. Comm'n*, 46 Va. App. 618, 624 (2005)). In sum, "[p]ure statutory construction . . . requires *de novo* review," *City of Virginia Beach*, 70 Va. App. at 73 (quoting *Citland*, 45 Va. App. at 275), while interpretations of statutes that fall within the agency's specialized knowledge, receive "great deference" and will only be reversed for abuse of discretion, *MPS Healthcare, Inc. v. Dep't of Med. Assistance Servs.*, 70 Va. App. 140, 147 (2019) (quoting *Fam. Redirection Inst., Inc. v. Commonwealth*, 61 Va. App 765, 772 (2013)). We evaluate the circuit court's conclusions of law within this framework.

ANALYSIS[6]

I. The circuit court correctly upheld the Board's findings of fact in its March 27, 2023 order.

Before us, Roberts challenges six findings of fact: 2(a), 2(d), 2(g), 2(h), 4, and 5. Because there is "substantial evidence" in the record, this Court will affirm the circuit court's decision to uphold the Board's factual findings. *See* Code § 2.2-4027.

_____

[6] The Board contends that this Court cannot review the factual findings or legal conclusions of the March 27, 2023 order, because it was a final order that became binding when neither party appealed. In contrast, Roberts suggests that while the order was "appealable," his

A. There is substantial evidence in the agency record supporting findings of fact Nos. 2(a), 2(d), and 2(h).

Finding of fact No. 2 found that Roberts "engaged in conduct of a sexual nature that a reasonable patient would consider lewd and offensive or that could reasonably be interpreted as intended for the sexual arousal or gratification of the practitioner, the patient, or both" in treating Patients A, B, and C.

Specifically, fact No. 2(a) found that during Patient A's course of treatment, Roberts pulled down Patient A's pants without warning or consent and exposed her buttocks to perform a gluteal massage. Later in Patient A's treatment, Roberts "touched patient A's vaginal opening with his fingers through her clothes . . . without offering any explanation or obtaining her permission."

The record includes extensive testimony documenting these incidents. Patient A testified that on her third appointment, Roberts "pulled down [her] sweatpants without telling [her] what he was going to do . . . and then massaged the area on [her] left buttocks." She also stated that during her last session with Roberts, he maneuvered her onto her back and placed "two fingers on the top of [her] vaginal opening, just totally out of the blue." Patient A reiterated that it left her very uncomfortable and while she "didn't consider it sexual" "[she] considered it completely inappropriate." Her husband corroborated her testimony, recounting that his wife disclosed the

_____

decision to accept the circuit court's remand does not preclude this Court's review of the merits of the March 27, 2023 order.

"[I]n cases where the ability of the Court to review an issue on appeal is in doubt, we may 'assume without deciding' that the issue can be reviewed provided that this permits us to resolve the appeal on the best and narrowest grounds." *McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (citing *Commonwealth v. White*, 293 Va. 411, 419 (2017)). Here, we find that the "best and narrowest" grounds to resolve this appeal is to address the merits of Roberts's first and third assignments of error. Accordingly, we will assume without deciding that the circuit court's March 27, 2023 order is properly before this Court.

incident the same day it happened. After reviewing the testimony, the Board concluded that Patient A was credible, and Roberts has not challenged this assertion.

Likewise, finding of fact No. 2(d) is supported by ample evidence. The Board found that while Patient B received a referral to Roberts for the specific treatment of neck pain, throughout treatment, Roberts pushed pelvic floor therapy despite Patient B's vocal opposition and a nurse practitioner's refusal to prescribe such treatment. In support, the Board relied on testimony from Patient B, Lynn Gufeld, L.N.P. (Patient B's nurse practitioner), and Cristina DiNunzio (Roberts's former colleague). Patient B explained that on her first visit to Roberts, he told her that she had pelvic floor dysfunction to which she responded, "that is not why I am here." She testified that during her third visit, Roberts came into the exam room and asked her if she "was in the mood to do pelvic floor therapy." After stating no, Roberts mentioned that pelvic floor therapy could help Patient B with painful intercourse—a subject Patient B denies ever raising with Roberts. Finally, Patient B and DiNunzio testified that despite Patient B's refusal to do pelvic floor therapy, Roberts sent DiNunzio into Patient B's exam room to raise the possibility of pelvic floor therapy once again.

In finding of fact No. 2(h), the Board concluded that Roberts treated Patient C intermittently over the years and on one occasion, in 2018 or 2019, Roberts touched Patient C with his fingers in her vaginal area using a technique that Patient C characterized as "quite like masturbation." Patient C testified that she was "surprised" by Roberts's action "so it went on for a minute" until she asked him to stop. Patient C stated that she felt "uncomfortable with it" and never received pelvic floor therapy from Roberts again.

Rather than challenge the witnesses' credibility, or refute their version of events,[7] Roberts attempts to recharacterize the incidents undergirding findings of fact 2(a), (d), and (h) as

---

[7] Indeed, Roberts's testimony to the Board confirmed the patients' accounts.

- 11 -

examples of uncomfortable but consensual treatments between physical therapist and patient. While the characterization of these facts is relevant for the agency's conclusions of law, without contradictory evidence in the record this Court will not disturb the agency's findings of fact. *See Rose v. Red's Hitch & Trailer Servs., Inc.*, 11 Va. App. 55, 60 (1990) (holding that it lies within the administrative agency's "authority to determine the facts and the weight of the evidence and its findings in that regard, when supported by credible evidence, will not be disturbed on appeal"). Consequently, the circuit court properly upheld findings of fact Nos. 2(a), (d), and (h).

B. Findings of fact Nos. 2(g), 4, and 5 are supported by the record.

In finding of fact No. 2(g), the Board found that Roberts's former employee Cristina DiNunzio witnessed Roberts perform pelvic floor therapy in a manner inconsistent with her training. DiNunzio testified Roberts "would use two fingers instead of one, which was common practice" and he would "have people put their feet on their shoulder" or perform treatment "where women were standing and facing away from him [while], he was inserting intravaginally or intra-anally." Again, Roberts does not contradict DiNunzio's version of events but instead argues that the Board cannot consider these statements as evidence that he violated a standard of care. But finding of fact No. 2(g) does not state that Roberts violated a standard of care. It simply alleges that Roberts did not perform pelvic floor therapy in a manner consistent with DiNunzio's training. This finding is supported by the record.

In finding of fact No. 4, the Board concluded that Roberts failed to document Patient C's informed consent for pelvic floor therapy from 2011 to 2018. The record indicates that while Patient C agreed to receive pelvic floor therapy, she did not sign a consent form until May 11, 2018, over six years after she began treatment. Thus, until May 11, 2018, Roberts had no written consent form on file for Patient C. Roberts does not challenge the factual allegation, but rather argues that he was not required to document informed consent and the Board should not have

relied on this fact in its ruling. The record contains no signed consent waivers until May 11, 2018, and Roberts did not contradict Patient C's testimony. Therefore, the circuit court did not err in upholding finding of fact No. 4.[8]

Finally, in finding of fact No. 5, the Board found that on August 14, 2020, after Patient B submitted a complaint to the Department of Health Professions, Roberts directed his attorney send a letter to Patient B threatening legal action. The record includes testimony from Patient B stating that she filed her complaint with the Department in March 2020, then received a cease-and-desist letter from Roberts's counsel in July 2020. The record also includes a copy of Patient B's complaint, the cease-and-desist letter, and Patient B's March 25, 2020 discharge papers. The discharge papers contained a note written by Roberts indicating that Patient B filed a complaint with the Department of Health. Roberts's note makes clear that he knew about the complaint before his attorney sent a cease-and-desist letter. Roberts testified that he did not send the cease-and-desist letter in response to Patient B's complaint, but rather in response to the slanderous statements Patient B made to his employees. But as the reviewing court, we defer all determinations of witness credibility to the trier of fact. *See Goodyear Tire & Rubber Co.*, 5 Va. App. at 381. In this case, the Board identified compelling evidence to support its conclusion that Roberts knew about Patient B's complaint as early as March 25, 2020, and sent a cease-and-desist letter in response to the complaint. As a result, we will not disturb the Board's finding of fact No. 5 nor the circuit court's decision to uphold that finding.

II. The circuit court correctly upheld the Board's conclusions of law Nos. 1 and 4.

We review the circuit court's decision to uphold the agency's conclusions of law using the standard of review outlined by the VAPA. While "the duty of the court with respect to issues

---

[8] Moreover, the Board's upheld conclusions of law and subsequent sanction did not rely on finding of fact No. 4.

- 13 -

of law shall be to review the agency decision de novo," Code § 2.2-4027, when the agency has been entrusted with wide discretion by the General Assembly, "the agency's decision is entitled to special weight in the courts," *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 244 (1988). And "[c]ourts generally defer to an agency's interpretation of its own regulations." *Mazloumi v. Dep't of Env't Quality*, 55 Va. App. 204, 209 (2009).

The circuit court correctly found that finding of fact Nos. 2(a), (d), and (h) constitute violations of Code § 54.1-3480(B)(3)-(4), Code § 54.1-3483(7), (10), and 18 VAC 112-20-190(A)(1) of the Regulations Governing the Practice of Physical Therapy ("Regulations").

> A. While treating Patients A, B, and C, Roberts engaged in "unprofessional conduct" of a sexual nature and performed acts likely to "harm" the public.

Under Code § 54.1-3480(B)(3)-(4), the Board may refuse to issue a license or suspend a license "for a stated period of time or indefinitely" for "[u]nprofessional conduct" or "[i]ntentional or negligent conduct that causes or is likely to cause injury to a patient." A licensed physical therapist "shall be considered guilty of unprofessional conduct" if he "[p]erforms any act likely to deceive, defraud, or harm the public," Code § 54.1-3483(7), or "[e]ngages in sexual contact with a patient concurrent with and by virtue of the practitioner/patient relationship or otherwise engages at any time during the course of the practitioner/patient relationship in conduct of a sexual nature that a reasonable patient would consider lewd and offensive," Code § 54.1-3483(10). Under 18 VAC 112-20-190(A)(1), sexual contact is "sexual behavior or verbal or physical behavior that[] . . . [m]ay reasonably be interpreted as intended for the sexual arousal or gratification of the practitioner, the patient, or both."

While there is no case law interpreting the relevant statutes or regulations, this Court has long held that circumstantial evidence of a defendant's intent may be shown by his conduct, and

- 14 -

the trier of fact "may infer that [the defendant] intends the natural and probable consequences of his acts." *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (en banc); *see also Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (holding that a fact finder may infer a defendant intends the "immediate" consequences of his voluntary conduct); *Robinson v. Commonwealth*, No. 0036-22-1, slip op. at 12 (Va. Ct. App. Aug. 23, 2022) (holding that a massage therapist's intent "to sexually molest, arouse, or gratify" could be inferred from the fact that during massage sessions he touched clients' private parts in violation of company policy). Here, the Board, as trier of fact, properly found that finding of facts Nos. 2(a), (d), and (h) demonstrated that Roberts engaged in physical and verbal behavior that "a reasonable patient would consider lewd and offensive," Code § 54.1-3483(10), or that "[m]ay reasonably be interpreted as intended for the sexual arousal or gratification of the practitioner, the patient or both," 18 VAC 112-20-190(A)(1).

First, in finding of fact No. 2(a), the Board found that Roberts pulled down Patient A's pants without warning and pressed her vaginal opening through her clothing. Roberts argues that the circuit court erred upholding the Board's conclusion of law because Patient A stated she did not consider the contact sexual. But violations of the regulations do not hinge on the patient's characterization of the conduct. Instead, the court must determine whether "a *reasonable* patient" would consider "conduct of a sexual nature" lewd and offensive, Code § 54.1-3483(10) (emphasis added); or if the conduct "*reasonably*" could be interpreted as intended for the sexual gratification of patient or practitioner, 18 VAC 112-20-190(A)(1) (emphasis added).

When a physical therapist touches a patient's privates without notice and in deviation from the patient's prior treatment, there is no doubt that a reasonable patient would consider such a sexual act "lewd and offensive," Code § 54.1-3483(10), or "intended for the sexual . . . gratification of . . . practitioner," 18 VAC 112-20-190(A)(1). Here, Patient A did not ask for

pelvic floor therapy. She did not consent to pelvic floor therapy. Any touching unrelated to Patient A's back injury fell outside the scope of the course of treatment. Despite all of this, Roberts touched Patient A's vaginal opening without warning. No doubt, a reasonable patient would find intimate touching "lewd and offensive." Code § 54.1-348(10). Indeed, Patient A testified that Roberts's contact "was just such a violation of [her] person" it caused her extreme discomfort and, "[she] considered it completely inappropriate." Because courts may infer a defendant's intent from his conduct, the circuit court did not err in holding that finding of fact No. 2(a) supported conclusion of law No. 1. *Robinson*, slip op. at 12.

Likewise, finding of fact No. 2(h) can reasonably be interpreted as conduct intended for the sexual gratification of patient or practitioner. 18 VAC 112-20-190(A)(1). Finding of fact No. 2(h) established that during Patient C's last appointment with Roberts, he placed his hand internally into her vagina and began "vigorously jiggling" in a manner much like "masturbation." Patient C noted that she had received the same treatment from female physical therapists and she never had a female therapist perform the maneuver internally. Roberts did not inform Patient C that he would be performing internal stimulation, and he did not explain the purpose of the treatment. Again, Roberts's conduct deviated from Patient C's normal course of treatment and made Patient C feel uncomfortable. This time, the patient herself described the conduct as sexual. While not dispositive, Patient C's description supports a finding that Roberts's "treatment" was sexual and could reasonably be construed as lewd and offensive under Code § 54.1-3483(10), or "as intended for the sexual arousal or gratification of the practitioner, the patient, or both," 18 VAC 112-20-190(A)(1).

Additionally, finding of fact No. 2(d) demonstrates that Roberts engaged in verbal behavior that "may reasonably be interpreted as intended for the sexual arousal or gratification of the practitioner, the patient, or both." 18 VAC 112-20-190(A)(1). Patient B testified that she

sought physical therapy solely for a neck injury, yet Roberts repeatedly pushed pelvic floor therapy throughout her treatment. Moreover, Roberts commented that he could tell Patient B struggled with pelvic floor dysfunction and told her that pelvic floor therapy would help her with sexual intercourse—two topics Patient B denied ever raising.

The Board also determined that findings of fact Nos. 2(a), (d), and (h) supported the conclusion that Roberts engaged in "[i]ntentional or negligent conduct that causes or is likely to cause injury to a patient," Code § 54.1-3480(B)(4), and "deceive, defraud or harm the public," Code § 54.1-3483(7). Roberts argues that the Board failed to introduce expert testimony to define a standard of care for pelvic floor therapy. Instead, he asserts, it erroneously relied on patients' perceptions and feelings as evidence of harm. In other words, Roberts believes that the Board could only find he acted in a manner likely to cause "harm" or "injury" if the Board first determined that he violated a set standard of care. This Court disagrees.

The General Assembly empowered the Board to suspend a physical therapist's license when he commits an act "that causes or is likely to cause injury to a patient," Code § 54.1-3480(B)(4), or "[p]erforms any act likely to deceive, defraud or harm the public," Code § 54.1-3483(7). Notably, the language of the two statutes at issue does not require the Board to first make a finding that the physical therapist deviated from the standard of care before finding a likelihood of harm or injury.[9] Instead, the Board must determine whether the therapist's conduct is "likely to cause injury to a patient," Code § 54.1-3480(B)(4), or cause "harm [to] the public," Code § 54.1-3483(7). As the statute does not define "injury" or "harm," familiar principles of

---

[9] We have interpreted similar language from the Department of Health Professions Board of Medicine's regulations and have upheld board decisions disciplining doctors for conduct likely to harm a patient or the public without making explicit findings that the doctor deviated from a prescribed standard of care. *See, e.g.*, *Mettetal v. Va. Bd. of Med.*, 83 Va. App. 182, 204-05 (2024) (finding likelihood of harm to the public when a doctor continued to prescribe opioid withdrawal medication to patients after they tested negative for the prescribed drug, and despite doctor's knowledge that the medication was regularly sold on the street).

statutory interpretation dictate that this Court assign the terms their common, ordinary meaning interpreted within the context of the statute. *See Am. Tradition Inst. v. Rector & Visitors of the Univ. of Va.*, 287 Va. 330, 341 (2014).

Black's Law Dictionary defines harm as "injury, loss, damage, material or tangible detriment." *Harm*, *Black's Law Dictionary* (11th ed. 2019). Similarly, Webster defines harm as "physical or mental damage, mischief, hurt, disservice, an act or instance of injury, or a material and tangible detriment or loss to a person." *Harm*, *Webster's Third New International Dictionary* (1966). Injury is defined as "a wrong or injustice" or "[a]ny harm or damage." *Injury*, *Black's Law Dictionary*, *supra*. Given the broad array of wrongs that constitute harm and injury, a look at the purpose behind the statute is helpful. *See Tel. Square v. 7205 Tel. Square LLC*, 77 Va. App. 375, 405-06 (2023) (a statute "should be read and applied so as to accord with the purpose intended and attain the objects desired if that may be accomplished without doing harm to its language" (quoting *Cartwright v. Commonwealth*, 223 Va. 368, 372 (1982))). The General Assembly indicated that the purpose of professional regulatory bodies is to prevent harm by ensuring the "preservation of the health, safety, and welfare of the public." Code § 54.1-100. Thus, harm in this context refers to any act likely to endanger the health, safety, or welfare of the public, while injury refers to specific "intentional or negligent" acts that cause physical or mental damage to a patient or patients.

As detailed above, Roberts demonstrated a pattern of pushing unwanted pelvic floor therapy on patients when the treatment was not requested nor included in the patient's prescribed treatment plan. The Board reasonably concluded that Roberts's continued disregard of patient preference endangers the welfare of the public. Patient A went so far as to characterize Roberts as someone whose "personality was for some reason not to tell [her] what he was going to do, or how long he was going to do it, or when." Even when patients consented to pelvic floor therapy,

he performed the treatment in a manner that left some patients feeling "violated," "uncomfortable," and "hurt." The Board need not speculate that Roberts is likely to "cause injury to a patient" because the record makes clear he already has. Thus, the Board did not err in finding that Roberts violated Code §§ 54.1-3480(B)(4), -3483(7), and the circuit court properly upheld conclusion of law No. 1.

> B. Roberts engaged in "unprofessional conduct" that posed "a danger to the health and welfare" of his patients and the public.

Conclusion of law No. 4 held that finding of fact No. 5 constituted a violation of Code § 54.1-3480(B)(3)-(4) and Code § 54.1-3483(4), (7). The Board concluded that when Roberts sent a cease-and-desist letter to Patient B after she filed a disciplinary complaint, Roberts engaged in "unprofessional conduct" or "conduct that causes or is likely to cause injury to a patient or patients." Code § 54.1-3480(B)(3)-(4). Specifically, the Board found that the letter was an act "likely to deceive, defraud or harm the public" and such an act could pose a "danger to the health and welfare of his patients or the public." Code § 54.1-3483(4), (7). Finding of fact No. 5 concluded that Roberts sent Patient B a cease-and-desist letter after she filed a complaint with the Board "despite the provision in Virginia Code § 54.1-2400.8[10] providing immunity[11]

---

[10] Code § 54.1-2400.8 reads

> any person (i) making a report regarding the conduct or competency of a health care practitioner as required by law or regulation, (ii) making a voluntary report to the appropriate regulatory board or to the Department of Health Professions regarding the unprofessional conduct or competency of any practitioner licensed, certified, or registered by a health regulatory board, or (iii) providing information pursuant to an investigation or testifying in a judicial or administrative proceeding as a result of such reports shall be immune from any civil liability resulting therefrom unless such person acted in bad faith or with malicious intent.

[11] Immunity statutes are designed to encourage whistleblowers to speak out without fear of reprisal. *See, e.g.*, *Commonwealth v. Commonwealth, ex rel., Hunter Labs., LLC*, 296 Va. 32,

from civil liability for persons making a report to any board of the Department regarding the unprofessional conduct of a licensee."

Patient B filed her complaint to raise alarm regarding Roberts's conduct and to provide vital information to the public. During the Board hearing, Patient B testified that while Roberts's cease-and-desist letter left her feeling "nervous," "scared," and "threatened," she filed her complaint because she was worried that Roberts could be performing pelvic floor therapy on patients who did not "want it or need it." Patient B stated that because of her professional background she "knew enough to say that [pelvic floor therapy was] not indicative for why [she was there] but others may not."

Roberts's cease-and-desist letter was an attempt to silence Patient B's warnings to the public. Roberts knew that Patient B filed a complaint with the board. Indeed, he documented the complaint in Patient B's record stating, "[p]atient never received pelvic floor treatment, but felt it was necessary to file a complaint against my license for inquiring about said treatment." Roberts sent the cease-and-desist letter shortly after Patient B filed her complaint. Furthermore, the letter specifically referenced Patient B's complaint and threatened legal action against Patient B if she continued to discuss her experiences with Roberts in public. The threat of legal action tends to have a chilling effect on the recipient's speech or conduct. *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 718 (4th Cir. 1991) ("We reject the attempt to silence one's adversaries in a public controversy by suing organizations attempting to inform the public."). Given this reality, the Board found that Roberts sent the cease-and-desist letter to muzzle Patient B and deprive the public of information that without a whistleblower, would remain hidden.

---

35 (2018) (the purpose of the immunity provision in the Virginia Fraud Against Taxpayers Act, is to encourage whistleblowers to "come forward with information . . . that might otherwise remain hidden" (quoting *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001))).

- 20 -

Whether Roberts intended to silence Patient B, the end result endangered the "health" and "welfare" of the public. Thus, this Court will not disturb conclusion of law No. 4.

      III. The circuit court correctly found that the Board's sanction on remand was not arbitrary and capricious.

      "[W]hen the appellant challenges a judgment call on a topic on which 'the agency has been entrusted with wide discretion by the General Assembly,' we will overturn the decision only if it can be fairly characterized as 'arbitrary or capricious' and thus a 'clear abuse of delegated discretion.'" *PharmaCann Va., LLC*, 77 Va. App. at 220 (quoting *Citland*, 45 Va. App. at 274). An agency's decision is arbitrary or capricious "when it is 'willful and unreasonable' and taken 'without consideration or in disregard of facts or law or without determining principle,' or when the deciding body 'departed from the appropriate standard in making its decision.'" *Id.* (quoting *New Age Care, LLC v. Juran*, 71 Va. App. 407, 428 (2020)). Absent "extraordinary circumstances" reviewing courts will not judicially supersede an agency's decision to impose a penalty within the statutory limits. *Va. Marine Res. Comm'n v. Insley*, 64 Va. App. 569, 577 (2015).

      The Board's sanction decision imposed on remand fell within the scope of its statutory authority and broad discretion. The General Assembly entrusted the Board with the exclusive authority to discipline physical therapists for violations of its governing statutes and regulations.[12] *See* Code § 54.1-2400(7), (9). When a physical therapist engages in "unprofessional conduct" as defined by the regulations, the Board has broad power to impose sanctions, including the suspension of a license "for a stated period of time or indefinitely." Code § 54.1-3480(B)(3). The Board is tasked with applying its expertise to fashion an

---

[12] Indeed, the circuit court remanded the matter to the Board precisely because the court did not know what the appropriate sanction would be given the findings of fact and conclusions of law that it upheld.

appropriate remedy within the spectrum of punishments authorized by Code § 54.1-3480(B). Nothing in the regulations requires the Board to prescribe sanctions that are tiered based on the severity of the offense. *See id*. And the Board is not required to reduce the length of a suspension simply because a circuit court remands a case for further consideration. Because the Board found Roberts engaged in "unprofessional conduct," the regulations empowered the Board to impose a suspension "indefinitely for a period of not less than two years." Consequently, the only question that remains before us is whether the length of the suspension was an abuse of discretion.

Roberts challenges the length of the suspension by arguing disparate treatment. He asserts that between 2015 and 2023, only five other physical therapists received summary suspensions, and none received suspensions longer than his. Roberts argues that of the five suspensions, each therapist had engaged in "egregious conduct" not present in his case including: sexual intercourse during treatment, practicing with a suspended license, sexual assault during treatment, and drug and alcohol abuse at work. Roberts concludes that the Board treated him "materially harsher" than any other. This Court disagrees.

Of course, evidence of disparate treatment can constitute one of the "extraordinary circumstances," *Insley*, 64 Va. App. at 577, where an agency abuses its discretion. *See PharmaCann Va., LLC*, 77 Va. App. at 225 ("If an agency treats similarly situated applicants dissimilarly, it acts in an arbitrary and capricious manner." (citing *Bd. of Supervisors of Fairfax Cnty. v. McDonald's Corp.*, 261 Va. 583, 591 (2001))). Indeed, an agency "'can be said to be at its most arbitrary' when it 'treat[s] similar situations dissimilarly.'" *Id.* (alteration in original) (quoting *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021)). But as the Supreme Court noted in other administrative professional misconduct cases, "[i]n arriving at the punishment to be imposed, precedents are of little aid, and each case must be largely governed

by the particular facts." *Morrissey v. Va. State Bar ex rel. Third Dist. Comm.*, 260 Va. 472, 479-80 (2000) (quoting *Maddy v. First Dist. Comm. of State Bar*, 205 Va. 652, 658 (1964)) (state bar disciplinary action); *Maddy*, 205 Va. at 658 (same).

Here, the Board issued a sanction rooted in the factual findings and legal conclusions upheld in the March 27, 2023 order. The record establishes that Roberts engaged in a pattern of unprofessional, sexual conduct, including inappropriate touching and violation of patients' boundaries. He touched Patient A's vaginal opening "without [her] permission and without explanation," he pushed pelvic floor therapy and attempted to conduct "pelvic manipulation" on Patient B against her wishes, and he performed internal vaginal stimulation on Patient C in a manner that felt "like masturbation" and left Patient C feeling extremely uncomfortable. This conduct raises serious concerns about a physical therapist's fitness to safely practice. Accordingly, the Board's decision did not single out Roberts or treated him "materially harsher" than other licensees.

Without evidence that the Board fashioned a sanction that lacked a "determining principle" or flouted the "facts or law," this Court cannot say the Board abused its discretion when it reinstated Roberts's two-year suspension, nor did the circuit court err in upholding the decision. *PharmaCann Va., LLC*, 77 Va. App. at 220.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*